SARAH J. RILEY, a/k/a Sally Riley, Plaintiff-Appellant and Cross-Appellee, v. PHYSICIANS WEIGHT LOSS CENTERS, INC., Defendant-Appellee and Cross-Appellant.

Third District   No. 3—88—0806

Opinion filed December 22, 1989.

24

Burt L. Dancey, of Elliff, Keyser, Oberle & Davies, P.C., of Pekin, for appellant.

Murvel Pretorius, Jr., and Paul P. Gilfillan, both of Quinn, Johnston, Henderson & Pretorius, Chartered, of Peoria, for appellee.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Plaintiff, Sarah J. Riley, appeals from summary judgment in favor of the defendant, Physicians Weight Loss Centers, Inc. (the Center), on her five-count complaint claiming personal injury as a result of the Center's negligence in failing to warn her of the potential health risks posed by its prescribed ketogenic diet or to adequately monitor her during the course of the diet so as to discover problems developing. The Center cross-appeals the court's denial of its motion to strike plaintiff's responsive affidavit. For the reasons set forth below, we dismiss the Center's cross-appeal, reverse the court's summary judgment and remand the cause for trial.

Plaintiff went to the Physicians Weight Loss Center in September 1984, after hearing its advertisement on a Peoria radio station. She was 42 years old at the time and weighed 251 pounds. She had tried several diet programs in the prior 10 years with intermittent success. The Center's personnel explained to her its program which called for a reduced-calorie limited-carbohydrate ketogenic diet designed to induce a state of ketosis in the dieter. When in ketosis, fat is metabolized from stored fat in the body and weight loss occurs. A doctor performed a simple physical, and plaintiff started on the diet. Plaintiff apparently signed contracts with the Center in September 1984 and again in January 1985, but they are not included in the record on appeal. There was no discussion between the Center's personnel and plaintiff about any health risks connected with the ketogenic diet; the diet was promoted to her as being completely safe. There were strict directions for her to follow as to the foods and caloric intake she was allowed. She was a very successful client on the program, achieving a loss of more than 70 pounds in a four-month period. Initially, she went to the Center daily and, later, weekly for weigh-in, urinalysis and blood-pressure checks.

In mid-December 1984, plaintiff experienced severe pain in her mid-epigastric area. She called her family doctor, Dr. Ameel Rashid,

on December 17 and described her pain to him. On December 26, she again called Dr. Rashid's office after suffering another attack of mid-epigastric pain. This time she talked to Dr. Donald Habecker, who arranged for a sonogram to be made on December 27. The sonogram revealed the presence of multiple gallstones. On New Year's eve, Dr. Habecker called plaintiff and told her she should see a surgeon. She saw Dr. Stewart Roberts in January 1985. He told her her gallbladder should be removed and that it was up to her as to when to proceed with the surgery.

Plaintiff continued on the ketogenic diet and going to the Center in January 1985. She was admitted to the hospital in February on an emergency basis for surgery, but surgery was not performed then due to her abnormal liver function. At that time, Dr. Roberts told plaintiff he thought her gallbladder problems were due to her ketogenic diet. After that hospitalization, she continued to visit at the Center, but she was not on the diet. She changed her personal physician in March and began seeing Dr. R. Michael Gulley. Dr. Gulley also indicated to her he thought the ketogenic diet caused the gallstones. She had her gallbladder removed on March 11, 1985.

Sometime after surgery, plaintiff started on a protein-sparing, modified fast diet, also a type of ketogenic diet, under Dr. Gulley's supervision. Prior to embarking on the diet, Dr. Gulley gave the plaintiff a written warning form which he stated is used to impress upon the dieter the serious nature of the diet. In pertinent part, the form warned the dieter that the protein-sparing, modified fast diet is associated with rare side effects such as gout, kidney stones, anorexia, nausea, vomiting, restlessness, irritability/euphoria, faintness, syncope, cessation of menses and cardiac arrhythmias (including death). Further, the decrease in thyroid hormone utilization as a result of the diet can cause cold intolerance, dry skin, hair loss and muscle cramps. At the conclusion of the form the dieter indicated his/her understanding that the above problems could occur and that he/she understands the need for regular follow-up care.

Dr. Gulley took the plaintiff off the protein-sparing, modified fast diet when she continued to have stomach problems. Plaintiff started the protein-sparing, modified fast diet on her own again, however, in fall 1985. Thereafter, plaintiff and Dr. Gulley agreed she could follow a balanced deficit diet, that is, a nonketogenic reduced-calorie diet utilizing all the food groups. As of the date of plaintiff's deposition on March 12, 1987, she stated she was still having the same type of mid-epigastric pain she had in December 1984 in addition to abdominal pain and spasm-type pain on her right side; she described the pain at-

tacks as frequent and of varying duration. After plaintiff's gallbladder surgery, she had chronic diarrhea necessitating hospitalization for tests, consultation with a gastroenterologist, and she was seen at the Mayo Clinic on three different occasions. Plaintiff had two surgeries subsequent to the gallbladder operation in connection with her stomach problems.

Plaintiff's first amended five-count complaint alleged causes of action against the Center with respect to failure to warn her that the known possible consequences and hazards of the ketogenic diet include "gallstones, kidney stones, anorexia, death, and other serious health problems" (counts I (negligence) and II (wilful and wanton misconduct)) and failure to adequately monitor her while on the diet for possible and potential complications arising from the ketogenic diet (counts III (negligence) and IV (wilful and wanton misconduct)). Count V purported to set forth the cause of action for false advertising; it was dismissed on the Center's motion to strike and dismiss counts II, IV and V of the plaintiff's first amended complaint. The Center answered, denying plaintiff's allegations and raising as a defense plaintiff's comparative negligence in failing to follow instructions, to monitor her own condition and progress and to ask questions about the diet plan.

Following discovery, the Center filed a motion for summary judgment supported by Dr. R. Michael Gulley's deposition. As to its failure to warn (counts I and II), the Center's motion alleged that it was Dr. Gulley's testimony that, assuming *arguendo* the standard of care applicable to physicians applied to it, that standard would not require warnings about the formation of gallstones on a ketogenic diet. Consequently, the Center's motion concluded there was no genuine issue of material fact as to whether it breached the standard of care owed to plaintiff. As to its failure to monitor (counts III and IV), the Center's motion alleged it was Dr. Gulley's testimony that careful monitoring of the plaintiff while on the ketogenic diet would not have detected the development of the gallstones before they became a problem.

In opposition to the Center's motion for summary judgment, plaintiff filed an affidavit of Dr. Gulley as her treating physician. Therein, Dr. Gulley acknowledged that although the standard of care would not require warnings about the formation of gallstones on a ketogenic diet, it was his further opinion that the standard of care "required warnings to anyone that there were serious risks, both known and unknown, in proceeding with a ketogenic diet, and that the risks included, but were not limited to, kidney stones, anorexia, and death,

as well as other health problems." Dr. Gulley stated further that the standard of care required disclosure that the potential for serious side effects and risks was much greater with a ketogenic diet than with more common diets.

As to the standard of care applicable to monitoring, Dr. Gulley restated his prior deposition testimony that sonography could have shown the development of gallstones, but he could not state whether any of the information available to the Center or which it should have sought from the plaintiff would have indicated the need for sonography or other sophisticated monitoring and testing techniques. He stated the standard of care applicable to monitoring would have included weekly visits conducted by a nurse specialist or physician who would ask the dieter questions aimed at discovering problems that the dieter might be having but would not volunteer, and monthly blood tests with liver screenings. Dr. Gulley further stated it is possible that such monitoring might have indicated an abnormality further investigation of which, in turn, could have disclosed the presence of developing gallstones.

The Center filed a supplement to its motion for summary judgment supported by a supplemental deposition taken of Dr. Gulley and by plaintiff's deposition. As to counts I and II, the Center argued that because there was no duty to warn specifically about the formation of gallstones, there could not have been a breach of the duty to warn, and warnings about other known risks were irrelevant. As to the causal connection between the Center's failure to warn and plaintiff's injury, the Center argued that even if warning of other potential health risks had been given the plaintiff, it is irrefutable that she continued on a ketogenic diet on two different occasions even after warning was given and after her gallbladder problem was detected.

As to counts III and IV, the Center argued there was no genuine issue of material fact as to whether monitoring would have detected plaintiff's condition sooner. Pointing to the supplemental deposition, it was Dr. Gulley's testimony that whether different monitoring by the Center would have discovered the plaintiff's problem earlier depended on whether she was symptomatic. If she was not symptomatic, the usual monitoring practices would not have identified a problem, and sonography would not have been warranted in the absence of symptoms. Dr. Gulley testified that plaintiff's gallstones may or may not have been present in November 1984, notwithstanding the fact the gallstones were present in December 1984. The Center argued plaintiff's deposition made it clear she was not symptomatic until mid-December 1984 when she first called Dr. Rashid and, thus, different

monitoring would not have discovered her problem sooner. The Center further argued the diet was not the proximate cause of the plaintiff's injury in that Dr. Gulley could not state based on a reasonable degree of medical certainty that it was more probably true than not that the diet she began in September 1984 contributed to cause her symptomatic gallstones. The Center argued Dr. Gulley's opinion that the ketogenic diet produced a physiological state of affairs that predisposed the plaintiff to develop gallstones which impacted in the biliary tract was insufficient to establish a nexus between the acts complained of and the plaintiff's injury since the consequences shown were merely possible, not probable.

The Center later filed a second supplement to its summary judgment motion supported by the depositions of plaintiff's former treating physicians, Dr. Ameel Rashid and Dr. Donald Habecker, and excerpts of the depositions of its expert witnesses, Dr. T. Edward Bynum and Dr. James Falko. The depositions of Doctors Rashid and Habecker confirmed that plaintiff's first reported mid-epigastric pain was on December 17. Dr. Bynum stated in his deposition that obese people have a strikingly greater incidence of gallstones and that the plaintiff's diet and gallbladder problems were merely coincidental. It was his opinion the ketogenic diet did not produce a physiological state that predisposed her to the development of the gallstones, but he could not say that the diet did not contribute to or aggravate the problem which plaintiff developed in the fall of 1984 and continues to experience. Dr. James Falko stated in his deposition excerpts that he believed plaintiff's obesity caused the gallstones to form, that the diet did not cause or contribute to the gallstones, nor did it produce a physiological state that predisposed her to the development of the gallstones or her subsequent problems.

Subsequent to the Center's second supplement to its motion for summary judgment, plaintiff filed a "Responsive Affidavit." Therein she stated that no warnings were given to her by the Center that there was any health hazard or risk involved with the ketogenic diet. She was led to believe that, as advertised, the ketogenic diet was completely safe. Plaintiff stated that if she had been informed there were serious health risks in proceeding on such a diet, she would not have begun the diet. She stated she continued with another type of ketogenic diet after her gallbladder surgery in order to maintain her weight, if not lose more weight, and her surgery seemed to be successful at that time. She continued to believe in the safety of ketogenic diets due to the Center's representations to her and based on her past success with the diet. She also had complete confidence in

Dr. Gulley's close supervision and monitoring of her while she was on the diet.

Plaintiff further stated in her responsive affidavit that in mid-November 1984 she experienced "some mild, frequent mid-epigastric pain on a regular, almost daily basis" which led her to believe that it was something in the nature of hunger pangs although not exactly of that nature. Plaintiff stated she was not questioned at the Center about any pain she might have been experiencing, nor was she told to report any and all pain or unusual problems she might be experiencing during the diet.

After hearing, the court granted the Center's motion for summary judgment as supplemented, finding that plaintiff did not create a question of fact with respect to causation. The court later denied the plaintiff's motion to reconsider and also denied the Center's subsequent motion to strike the plaintiff's responsive affidavit. The plaintiff appeals the denial of its motion to reconsider, and the Center cross-appeals the denial of its motion to strike plaintiff's responsive affidavit.

■ Although the plaintiff has not raised the issue, this court's well-settled duty to determine whether it has jurisdiction to entertain an appeal requires consideration of whether the Center has standing to cross-appeal. (*Hanson v. Illinois Central Gulf R.R. Co.* (1988), 174 Ill. App. 3d 723, 725-26; *Davis v. International Harvester Co.* (1988), 167 Ill. App. 3d 814, 818.) We conclude that it does not.

■ The right to appeal exists only in favor of a party whose rights have been prejudiced by the judgment or decree from which the appeal is taken. (*Hanson*, 174 Ill. App. 3d at 725.) A party who obtains by judgment all that he has requested cannot appeal from the judgment. (*In re East Lake Fork Special Drainage District* (1985), 137 Ill. App. 3d 473, 476.) It is the judgment of the trial court, and not whatever else may have been said by it, which is on appeal to the court of review. *In re East Lake Fork Special Drainage District*, 137 Ill. App. 3d at 476.

■ Notwithstanding the court's denial of the Center's motion to strike the plaintiff's responsive affidavit, the court's judgment here was not "in part" against the Center, and no cross-appeal was required. (*Anderson v. Sutter* (1983), 119 Ill. App. 3d 1070.) The Center's argument as to the impropriety of the plaintiff's responsive affidavit will be considered, however, insofar as that argument may sustain the court's summary judgment. *Davis*, 167 Ill. App. 3d at 819; *Wilcoxen v. Board of Education of Canton Union School District No. 66* (1983), 116 Ill. App. 3d 380, 383.

■ Turning to the plaintiff's appeal, a claim of negligence requires a showing of three elements: a duty owed by the defendant to the plaintiff, a breach of that duty and an injury to the plaintiff proximately caused thereby. (*Watkins v. Mt. Carmel Public Utility Co.* (1988), 165 Ill. App. 3d 493; *Lindenmier v. City of Rockford* (1987), 156 Ill. App. 3d 76.) A count charging wilful and wanton misconduct will include these same elements but will indicate that the defendant acted with intentional or conscious disregard of the duty owed to the plaintiff rather than that the defendant acted merely carelessly. (*Hough v. Mooningham* (1986), 139 Ill. App. 3d 1018; *Pendowski v. Patent Scaffolding Co.* (1980), 89 Ill. App. 3d 484.) Before liability can be settled on the defendant, a nexus between the defendant's negligent act or omission and the injury suffered by the plaintiff must be shown. (*Taylor v. Gerry's Ridgewood Inc.* (1986), 141 Ill. App. 3d 780.) Liability for negligence cannot be predicated upon surmise or conjecture as to the cause of the injury; cause in fact is established only when there is a reasonable certainty that the defendant's conduct caused the injury. *Moore v. Hill* (1987), 155 Ill. App. 3d 1.

■ The purpose of summary judgment is to determine the presence or absence of triable issues of fact, and in determining whether the moving party is entitled to summary judgment, the pleadings, depositions, admissions and affidavits should be construed strictly against the movant and liberally in favor of the opponent. (*Smith v. South Shore Hospital* (1989), 187 Ill. App. 3d 847; *Vincent DiVito, Inc. v. Vollmer Clay Products Co.* (1989), 179 Ill. App. 3d 325.) Although a party against whom a motion for summary judgment has been filed need not prove the case at the preliminary stage, some factual basis must be presented that would arguably warrant judgment in the nonmovant's favor. *Fuentes v. Lear Siegler, Inc.* (1988), 174 Ill. App. 3d 864.

■ A motion for summary judgment must be denied and the resolution of facts and inferences must be made at trial if any facts upon which reasonable persons could disagree are identified, or if inferences leading to different conclusions fairly could be drawn from the facts. (*Diamond Headache Clinic, Ltd. v. Loeber Motors, Inc.* (1988), 172 Ill. App. 3d 364.) Summary judgment for the defendant is proper if, from the papers on file, the plaintiff fails to establish an element of the cause of action. (*Pyne v. Witmer* (1989), 129 Ill. 2d 351, 358.) Although the question of proximate cause is ordinarily one for the trier of fact, where it is apparent from the undisputed facts that only one conclusion can be drawn, the question then becomes one for the court to resolve as a matter of law. (*Lindenmeier*, 156 Ill. App.

3d at 76.) On appeal, the court will reverse an order granting summary judgment if it determines that a material question of fact exists and that the moving party is not entitled to judgment as a matter of law. *Estate of Kern v. Handelsman* (1983), 115 Ill. App. 3d 789.

Relying primarily on her responsive affidavit, plaintiff argues that summary judgment should not have been granted where there were disputed issues of material fact as to whether the Center's breach of its duty to warn and to monitor proximately caused her injury. The defendant argues there were no genuine issues of material fact and, further, that the plaintiff's responsive affidavit directly contradicted her deposition testimony and, as such, it should have been stricken by the trial court and should not be considered by this court.

It is well settled that a party cannot create a factual dispute by contradicting a previously made judicial admission. (*Schmall v. Village of Addison* (1988), 171 Ill. App. 3d 344, 348; *Hansen v. Ruby Construction Co.* (1987), 155 Ill. App. 3d 475, 480.) A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's peculiar knowledge. (*Hansen*, 155 Ill. App. 3d at 480; *Schmahl v. A.V.C. Enterprises, Inc.* (1986), 148 Ill. App. 3d 324.) The equivocalness of a statement is a question of law (*Hansen*, 155 Ill. App. 3d at 480; *Tom Olesker's Exciting World of Fashion, Inc. v. Dunn & Bradstreet, Inc.* (1979), 71 Ill. App. 3d 562) to be determined by reference to the entirety of the statement and not merely portions of it (*Schmall*, 171 Ill. App. 3d at 348).

Among other points, plaintiff argues that a genuine issue of material fact exists as to whether she would have proceeded on the Center's diet had she been warned of the serious health risks posed by such a diet. The Center argues plaintiff's subjective assertion that she would not have proceeded with the diet stands in direct contradiction to the undisputed objective fact shown by her deposition testimony, which was corroborated by Dr. Gulley's deposition, that she continued with a ketogenic diet even after her gallbladder surgery and after she had been informed of the health risks posed by a ketogenic diet. The Center relies on *Marshall v. University of Chicago Hospitals & Clinics* (1987), 165 Ill. App. 3d 754, in support of its position that its failure to warn was not the proximate cause of the plaintiff's injury where it is clear she proceeded with a ketogenic diet even after warning had been given.

In *Marshall*, the plaintiff failed to prove that the defendants' failure to meet the standard of care was the proximate cause of her injury. Plaintiff there became pregnant with her fifth child after elective surgical sterilization by tubal ligation. After she delivered the child,

tubal ligation was performed again. Her amended complaint for malpractice alleged the defendants failed to inform her that there was 1% chance of failure of tubal ligation to prevent future pregnancies. It was further alleged that had she known the failure rate of 1%, she would not have undergone that procedure. The jury found for the plaintiff, and the defendants appealed denial of their post-trial motion for judgment *n.o.v.* or for a new trial.

On appeal, the court found that judgment *n.o.v.* should have been entered in favor of the defendants on the issue of proximate cause. The court stated that it was not enough for the plaintiff to subjectively assert at trial that, had she known that tubal ligation was only 99% effective, she would have chosen instead the 90% effective birth control pills even though they made her sick. The court held plaintiff was required to show by objective evidence that a reasonable person in possession of the allegedly omitted information would have rejected the tubal ligation procedure. In view of the irrefutable evidence there that the plaintiff underwent a second tubal ligation after the birth of her child, the only reasonable inference that could be drawn from that objective evidence was that a reasonable person in the plaintiff's position would not have refused the tubal ligation.

We find *Marshall* distinguishable from the instant cause. Although the objective evidence here shows plaintiff did resume a ketogenic diet even after Dr. Gulley warned her of the health risks, gallstones were not included as one of the specific "known" risks, and plaintiff believed that her gallbladder surgery had been successful. Moreover, she stated she continued to believe in the complete safety of a ketogenic diet as it had been promoted to her by the Center. Dr. Gulley testified in his deposition that he had problems explaining to the plaintiff that ketogenic diets were not as safe as she had previously been led to believe. Significantly, also, she had been tremendously successful in losing weight while on the ketogenic diet where other diets had failed.

Consequently, and despite the fact gallstones were not one of the known risks, we believe a genuine issue of material fact exists as to whether plaintiff would have undertaken the diet in the first instance had the Center warned her of any of the known possible health risks rather than promoting the diet as completely safe. Unlike *Marshall*, where a trial had already taken place, plaintiff here did not need to prove her case at the summary judgment stage. Rather, she needed only to present a sufficient factual basis which would entitle her to recover under the law. *Kenner v. Northern Illinois Medical Center* (1987), 164 Ill. App. 3d 366.

As to whether plaintiff presented a sufficient factual basis to show the ketogenic diet was the proximate cause of her injury, plaintiff's treating physician, Dr. R. Michael Gulley, testified within a reasonable degree of medical certainty that the ketogenic diet produced a physiological state of affairs that predisposed her to the development of gallstones and that those gallstones impacted in the biliary tract, causing her biliary colic. The Center's expert witnesses, Drs. Bynum and Falko, concluded in their deposition testimony that there was no causal connection between the ketogenic diet and the plaintiff's development of gallstones, although Dr. Bynum testified he could not say that the diet did not contribute to or aggravate the problem the plaintiff developed in the fall of 1984. The Center argues that no genuine issue of material fact exists in light of the following deposition testimony given by Dr. Gulley:

"Q. [Counsel for the Center] Is it your opinion based upon a reasonable degree of medical certainty that it's more probably true than not that the diet that [plaintiff] started on in the fall of 1984 contributed to cause her gallstones—let me change that to say symptomatic gallstones?

A. [Dr. Gulley] I think that's an unanswerable question.

Q. No opinion?

A. I have no opinion."

Plaintiff suggests, and we agree, that this apparent inconsistency in Dr. Gulley's testimony is grounded in a distinction drawn by him between symptomatic and asymptomatic gallstones. Dr. Gulley testified that the gallstones themselves, unless they are impacted in the common bile duct or the cystic duct, do not cause pain. Consequently, although he testified he believed the diet predisposed the plaintiff to develop gallstones, he could not testify that the diet caused her gallstones to become symptomatic.

■■■ Given the testimony of the three doctors, we believe a genuine issue of material fact exists as to whether the ketogenic diet was the proximate cause of the plaintiff's injury. The Center correctly notes that liability is not imposed for consequences which are merely possible but, rather, only for those consequences which are probable according to ordinary and usual experience. (*Gray v. Pflanz* (1950), 341 Ill. App. 527, 533.) It argues, therefore, that the diet's mere "predisposition" of the plaintiff to develop gallstones precludes it from being the proximate cause of her injury.

■■■ We agree with the plaintiff that Dr. Gulley's deposition testimony, construed most favorably for her as the nonmovant, was that the diet "set in motion" a process which led to the development of

gallstones and, as such, it was an active cause of plaintiff's injury and not merely a passive, possible cause. It is well established that there can be more than one proximate cause of an injury. (*Countryman v. County of Winnebago* (1985), 135 Ill. App. 3d 384.) "A proximate cause of an injury is any cause which, in natural or probable sequence, produced the injury. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." *Batteast v. Wyeth Laboratories, Inc.* (1988), 172 Ill. App. 3d 114, 128, *appeal allowed* (1988), 123 Ill. 2d 556.

■■■ Inasmuch as we find from our examination of the record that there are genuine issues of material fact presented as to the plaintiff's claim that the Center's breach of its duty to warn proximately caused her injury, we must reverse the trial court's summary judgment as to counts I and II of the complaint and remand the cause for trial.

We do not find a genuine issue of fact exists, however, as to whether the Center's failure to monitor her adequately while she was on the diet was the proximate cause of her injury. Plaintiff argues a genuine issue of material fact exists, and, in support, she points to her responsive affidavit in which she stated she experienced "some mild, frequent mid-epigastric pain on a regular, almost daily basis" in mid-November of 1984 which continued until mid-December 1984 when she suffered her first attack of excruciating pain. She then points to Dr. Gulley's deposition testimony which, given the assumption that she was experiencing out-of-the-ordinary mid-epigastric pain in mid-November, concluded that adequate monitoring would have picked up on this and further investigation would have been triggered. It was Dr. Gulley's opinion that further investigation, in turn, although perhaps not preventing the gallbladder surgery, may have allayed the severity or seriousness of her subsequent problems.

Plaintiff's two references to pain in her deposition testimony were both about the pain she first experienced in mid-December:

"Q. [Counsel for the Center] Now, you apparently, or is it your understanding you were diagnosed with gall bladder problems in '85, February?
A. [Plaintiff] Yes—no, in December, late December of '84.
Q. Is that the first you ever had gall bladder problems?
A. Yes.
Q. That's the first you ever had symptoms like that?
A. Yes.
Q. What symptoms did you have in December, 1984?
A. Severe pain in the mid epigastric area.

Q. By mid epigastric, what do you mean?

A. Where the ribs come together, dead center, excruciating pain.

Q. In layman's terms, maybe the high stomach area?

A. That would describe it.

Q. Yes.

* * *

Q. [Counsel for the Center] Did you see a physician at any time during this period?

A. No, I had just seen Dr. Rashid around Labor Day of '84 and had a complete exam.

Q. You didn't see him at all between the time you started this diet, and the end of 1984?

A. No.

Q. You started having stomach problems then?

A. Yes.

Q. When was that again?

A. It was mid December.

Q. And you had upper stomach pains?

A. Yes."

Plaintiff argues her responsive affidavit is not improperly contradictory of her deposition testimony because counsel never asked during the deposition about other, less severe problems she might have experienced during the course of the diet which did not cause her to seek a doctor's care. Taking plaintiff's deposition testimony in its entirety as required, however (*Schmall*, 171 Ill. App. 3d at 348), it shows she "felt fine" until she suffered the attack in mid-December. She testified in her deposition as follows:

"Q. [Counsel for the Center] What was your rate of weight loss with Physicians Weight Loss?

A. [Plaintiff] It was rapid.

Q. How much per week?

A. I don't have the chart in front of me, I know I weighed 251 when I started, and in January I was down to 180, but when you first start a diet the weight loss is more rapid, of course.

Q. Did you discuss the rate of weight loss with Physicians' people?

A. They were thrilled, so was I."

She further testified:

"Q. [Counsel for the Center] Was the program designed for you to accomplish a 50 pound weight loss in the first seventeen weeks?

A. [Plaintiff] When I had my initial conference with the counselor, they projected how much I could lose in a certain period and I don't have it in front of me, the contract, so I couldn't tell you what they projected.

\* \* \*

Q. You were under the impression you were ahead of schedule or behind schedule?

A. I felt fine, I was doing beautifully."

■■ Taken in its entirety, the plaintiff's deposition testimony unequivocally shows that she first became symptomatic in mid-December 1984. Her responsive affidavit stating she experienced mild, almost daily mid-epigastric pain from mid-November to mid-December stands in direct contradiction to her testimony that she "felt fine," was "doing beautifully" and was "thrilled" with her weight loss program. Inasmuch as this portion of plaintiff's responsive affidavit contradicts her previously made judicial admissions, it should have been stricken, and it cannot be viewed as having created a genuine issue of material fact. Further, Dr. Gulley's opinion that adequate monitoring would have picked up on her pain in mid-November based on this faulty assumption should not be considered. *Cf. Myers v. Williams* (1987), 160 Ill. App. 3d 707, 712-13 (where the court found it was not reversible error for the trial court to have refused to allow into evidence the response of an expert witness to a hypothetical question which assumed facts not in evidence).

■■ Disregarding Dr. Gulley's testimony based on this improper assumption, it was Dr. Gulley's undisputed testimony that if plaintiff was not symptomatic prior to mid-December 1984, the accepted routine monitoring of ketogenic dieters would probably not identify gallstones since sonography or other sophisticated testing techniques would not have been undertaken in the absence of symptoms. Excerpts from the depositions of the Center's expert witnesses, Drs. Bynum and Falko, did not include any relevant testimony as to this monitoring issue. Consequently, the only inference to be drawn from the undisputed facts is that the Center's alleged breach of its duty to monitor plaintiff was not the proximate cause of her injury.

For the reasons above, the circuit court's summary judgment as to counts I and II is reversed and the cause remanded for trial. The circuit court's summary judgment as to counts III and IV is affirmed.

Judgment affirmed in part and reversed and remanded in part.

WOODWARD and DUNN, JJ., concur.