HIRAM C. HALL, Plaintiff, v. COUNTRY CASUALTY INSURANCE COMPANY, Defendant-Appellee and Cross-Appellant (Ansvar America Insurance Company, Defendant-Appellant and Cross-Appellee; Dennis A. Shaw, Defendant).

Second District   No. 2—89—1072

Opinion filed October 24, 1990.

Jay S. Judge and Martin D. Hoke, both of Judge & Knight, Ltd., of Park Ridge, for appellant.

David J. Brown, of Tuite, Shaw, Gesmer, Finnegan & Tuite, of Rockford, Wilson D. Burnell, of Stoecker & Stoecker, of Aurora, and Joseph P. Condon, of Condon & Zopp, of Crystal Lake, for appellees.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

The defendants, Ansvar America Insurance Company (Ansvar) and Country Casualty Insurance Company (Country Casualty), appeal and cross-appeal, respectively, from the summary judgment entered by the circuit court of McHenry County upon the plaintiff's, Hiram Hall's, and Country Casualty's cross-motions for summary judgment in Hall's complaint for declaratory judgment. In light of the pendency of a counterclaim for declaratory judgment filed by Ansvar against defendants Country Casualty, Hall and Shaw, the court modified its summary judgment to include its finding pursuant to Supreme Court Rule 304 that there was no reason to delay enforcement or appeal of the judgment. 107 Ill. 2d R. 304(a).

Ansvar insured a 1972 Chevrolet Monte Carlo and a 1976 American Motors Pacer for its named insured, defendant Dennis Shaw. Country Casualty Insurance Company insured a 1977 Oldsmobile station wagon belonging to its named insured, Evelyn Walters. On September 11, 1984, Shaw was driving Walters'_Oldsmobile while towing an inoperable 1965 Ford Mustang which he had recently purchased as a repair project for his son. The plaintiff, Hiram Hall, was riding in and steering the Mustang. On a curve in rural McHenry County, the Mustang broke loose from the Oldsmobile, crossed over the center line, and was struck by an oncoming car driven by Robert Nebel. Hiram Hall was injured in this accident. There was no damage to the Oldsmobile.

Hall subsequently filed the instant declaratory judgment action against Ansvar, Country Casualty and Dennis Shaw seeking a determination as to the coverage available for Shaw while driving Walters' 1977 Oldsmobile and towing the 1965 Ford Mustang. Specifically, Hall asked the court to find that Walters' Country Casualty policy provided medical payment coverage and liability coverage for and on behalf of Hall and Shaw, respectively; that Shaw's newly acquired Mustang either fell within Shaw's Ansvar policy's newly acquired vehicle provision or the insured vehicle provision of Walters' Country Casualty policy; and that Shaw's Ansvar policy provided medical payment coverage and liability coverage for and on behalf of Hall and Shaw, respectively.

In answer to Hall's second amended complaint for declaratory judgment, each insurer asked the court to determine that no coverage for the incident was owed under its policy.

After depositions were taken, Hall moved for summary judgment against Country Casualty. Supported by excerpts of the deposition testimony of Walters and Shaw, Hall contended there was no genuine issue of material fact regarding Shaw's status at the time of the accident as a permissive user of the 1977 Oldsmobile. Consequently, he asserted, there was no issue of fact regarding Country Casualty's coverage for Shaw's use of the vehicle.

Country Casualty responded by filing a cross-motion for summary judgment. Although the motion purported to incorporate therein "a summary of the relevant facts supported by excerpts from the discovery depositions of Evelyn Walters and Dennis Shaw and other documents," we have been unable to locate such summary or excerpts in the record. We note Shaw's complete discovery deposition and excerpts of Walters' deposition appear otherwise in the record, however. Country Casualty contended in its motion that Shaw, not Walters, was the owner of the Oldsmobile on the date of the accident; that the towed Mustang was not a "trailer" entitled to coverage under Walters' policy with it; and that Ansvar had insurance coverage on both the Oldsmobile and Mustang as either additional or replacement vehicles in lieu of Shaw's 1976 Pacer which, it is undisputed, was disposed of by Shaw prior to the accident. Country Casualty requested a summary determination of the insurance coverages available for both vehicles and of the "rights, duties, and obligations" of both itself and Ansvar under their respective policies.

After reviewing the parties' memoranda of law and hearing oral arguments, the trial court found that Evelyn Walters did not make a gift of the 1977 Oldsmobile to Dennis Shaw until after the accident

and that Shaw was a permitted user of the Oldsmobile at the time of the accident. Consequently, coverage under Walters' Country Casualty auto policy followed the vehicle. The court also found that the 1965 Ford Mustang was not a covered auto under Walters' Country Casualty policy and did not qualify for coverage under that policy as a trailer. Without further explanation, the court concluded, "Ansvar America Insurance Company must provide primary coverage for the damages caused by the Mustang." It ordered that:

"1. Defendant Country Casualty Insurance Company provide coverage for those damages occasioned by the involvement of the 1977 Oldsmobile station wagon in the accident on September 11, 1984; and

2. Defendant Ansvar America Insurance Company provide the coverage contained in its policy for those damages occasioned by the involvement of the 1965 Ford Mustang in the accident on September 11, 1984."

Ansvar contends the court erred in determining that Shaw's 1965 Ford Mustang was a covered automobile under the terms of its "Advantage Auto Policy" because the Mustang was neither a "replacement" vehicle entitled to automatic coverage, nor was it entitled to coverage as an "additional" vehicle where Shaw did not request Ansvar to insure it within 30 days of its acquisition. Country Casualty responds that the Mustang was automatically covered under the "replacement" or "additional" covered auto provisions of Shaw's Ansvar policy and, in its cross-appeal, contends the court erred in its determination that Evelyn Walters did not make a gift of the 1977 Oldsmobile station wagon to Dennis Shaw prior to the date of the accident.

At the outset, we consider Ansvar's motion, taken with the case, to strike those portions of Country Casualty's brief which support affirmance of the court's order that Ansvar must provide coverage under Shaw's policy for those damages occasioned by the involvement of the 1965 Ford Mustang. Ansvar contends Country Casualty is not a proper appellee in its appeal since Country Casualty has no interest which is adverse to a setting aside or reversal on appeal of the court's judgment against Ansvar with respect to the Mustang. See *Hoffman v. Nustra* (1986), 143 Ill. App. 3d 259, 264 (defining "appellee").

Country Casualty filed its objections to Ansvar's motion to strike, arguing it does have an interest adverse to a setting aside or reversal of the court's judgment as to the Mustang inasmuch as both insurers' policies contain similar "Other Insurance" provisions, to wit:

"OTHER INSURANCE

If there is other applicable liability insurance we will pay only

our share of the loss. Our share is the proportion that our limit of liability bears to the total of all applicable limits. However, any insurance we provide for a vehicle you do not own shall be excess over any other collectible insurance."

In light of these reciprocal "other insurance" provisions, Country Casualty argues its right to contribution from Ansvar in the event it is required to pay for any injuries or damages incurred by the plaintiff is " 'adverse to setting aside, or reversing the judgment.' " Country Casualty cites no authority in support of its contention concerning its right to contribution under the "Other Insurance" provisions.

This court requested Ansvar's reply to Country Casualty's objections pursuant to Supreme Court Rule 361. (107 Ill. 2d R. 361(b)(2).) Therein, Ansvar argues Country Casualty's objections should be rejected inasmuch as they are premised improperly on the fact the Mustang was a covered automobile under Shaw's Ansvar policy which "fact" is the ultimate issue presented in Ansvar's appeal. Ansvar contends the only parties with interests adverse to a setting aside of the court's judgment are its insured, Dennis Shaw, and the plaintiff, Hiram Hall. Neither of those parties has filed an appellee's brief. In contrast, Country Casualty has no direct interest in Ansvar's appeal since the court's judgment against it was only "for those damages occasioned by the involvement of the 1977 Oldsmobile station wagon." The damages, if any, occasioned by the involvement of the Oldsmobile have yet to be determined. Whatever the result of such determination, Ansvar argues, a determination by this court that coverage for the Mustang does not exist under the Ansvar policy is not tantamount to a finding that coverage for that automobile must be provided under the Country Casualty policy.

As to Country Casualty's "right to contribution," Ansvar asserts such a right under the Illinois Contribution Act (Ill. Rev. Stat. 1987, ch. 70, par. 301 *et seq.*) exists only as to Dennis Shaw; that is, Country Casualty "stands in the shoes of its insured, Evelyn Walters, and seeks to recover contribution from Shaw for any damages it might have to pay because of the involvement of Shaw's automobile (the 1965 Mustang)." Ansvar argues a reversal of the court's judgment regarding the Mustang would not affect Country Casualty's right to contribution from Shaw. Rather, it would simply eliminate one source of funds Shaw could turn to in the event a contribution judgment was entered against him.

■ ■ We reject Country Casualty's argument it is a proper appellee in Ansvar's appeal in light of the "Other Insurance" provisions of Shaw's and Walters' policies. In *Pekin Insurance Co. v. Cincinnati*

*Insurance Co.* (1987), 157 Ill. App. 3d 404, 406, the court defined "contribution" as "an equitable principle arising among coinsurers which permits one who has paid the entire loss to receive reimbursement from the other insurer liable for the loss." In any contribution action, there must be identity between the policies as to the parties and insurable interests and risks; that is, the policies are written to cover the same insured and the same risk. (*Pekin,* 157 Ill. App. 3d at 407.) Country Casualty and Ansvar are not coinsurers where there is no identity between the policies as to the same insured and the same risk. Further, if Shaw is considered a permissive user of Walters' car, he is an "insured" under Walters' Country Casualty policy, which is then primary. If Shaw is considered the owner rather than the permissive user of the 1977 Oldsmobile station wagon, his own Ansvar policy would be primary. This comports with the general rule that the owner's policy is primary whereas the driver's policy is excess, and until such time as the limits of the primary coverage are exhausted, the secondary coverage does not provide any collectible insurance. *Farmers Automobile Insurance Association v. Iowa Mutual Insurance Co.* (1966), 77 Ill. App. 2d 172.

■ Accordingly, we grant Ansvar's motion to strike. This effectively places the appeal in the posture of having no appellee's brief, and, as such, we proceed to consider the merits of Ansvar's appeal pursuant to the guidelines established in *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 133.

We are asked here to determine whether the trial court erred in entering the instant summary judgment against Ansvar and Country Casualty because (1) (Ansvar's appeal) the 1965 Ford Mustang did not fall within the definition of "Your Covered Auto" in Shaw's Ansvar policy and (2) (Country Casualty's cross-appeal) Evelyn Walters made a gift of the 1977 Oldsmobile station wagon to Shaw before the accident occurred.

■ Before turning to the merits of these issues, we bear in mind that entry of summary judgment in declaratory judgment proceedings is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. (*Butler v. Economy Fire & Casualty Co.* (1990), 199 Ill. App. 3d 1015, 1021; *Mortell v. Insurance Co. of North America* (1983), 120 Ill. App. 3d 1016, 1024; Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(c).) Summary judgment is a drastic means of disposing of litigation; it should not preempt the opposing party's right to a jury trial if there is a genuine issue of material fact (*Kolakowski v. Voris* (1979), 76 Ill. App. 3d 453, *aff'd* (1980), 83 Ill. 2d 388), and it should be granted only when the

right of the moving party to such judgment is clear and free from doubt. (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240.) When considering a motion for summary judgment, the trial court must consider all of the evidence before it and construe it most strictly against the movant and liberally in favor of the party against whom judgment is sought. (*Butler*, 199 Ill. App. 3d at 1021.) On review, the court will reverse an order granting summary judgment if it determines that a material question of fact exists and that the moving party is not entitled to judgment as a matter of law. *Riley v. Physicians Weight Loss Centers, Inc.* (1989), 192 Ill. App. 3d 23, 33.

■■■ We first consider Ansvar's contention the 1965 Ford Mustang was not a covered auto under Shaw's policy with it. Contracts of insurance are subject to the same rules of construction applicable to other types of contracts. (*Butler*, 199 Ill. App. 3d at 1021.) If the writing is unambiguous, the court must necessarily determine the intention of the parties solely from the language in the document itself. (*Comet Casualty Co. v. Holloman* (1983), 113 Ill. App. 3d 271, 275.) Where the facts are not in dispute, their legal effect, such as whether those facts fall within the provisions of an insurance policy, is a matter of law rather than the province of a fact finder. (*United Farm Bureau Mutual Insurance Co. v. Elder* (1981), 86 Ill. 2d 339, 346.) As a question of law, the question of the coverage provided under the terms of the policy can be determined upon review independent of the trial court's judgment. *Butler*, 199 Ill. App. 3d at 1021; *Bohnen International, Inc. v. Liberty Mutual Insurance Co.* (1983), 120 Ill. App. 3d 657, 662-63.

According to the applicable terms of an amendatory endorsement to Shaw's policy with Ansvar, "Your Covered Auto" means:

"1. Any vehicle shown in the Declarations.

2. Any of the following types of vehicles on the date you become the owner:

a. a private passenger auto; or

b. a pickup, panel truck or van.

This provision applies only if:

a. you acquire the vehicle during the policy period;

b. you ask us to insure it within 30 days after you become the owner; and

c. with respect to a pickup, panel truck or van, no other insurance policy provides coverage for that vehicle.

If the vehicle you acquire replaces one shown in the Declarations, it will have the same coverage as the vehicle it replaced. You must ask us to insurance a replacement vehicle within 30 days only if:

a. you wish to add or continue Coverage for Damage to Your Auto; or

b. it is a pickup, panel truck or van used in any business or occupation, other than farming or ranching.

If the vehicle you acquire is in addition to any shown in the Declarations, it will have the broadest coverage we now provide for any vehicle shown in the Declarations."

■ Ansvar contends the terms of its "Advantage Auto Policy" covering Dennis Shaw are clear and unambiguous and must be applied as written. We agree and find the Mustang was not a covered auto under Ansvar's policy.

As noted previously, Shaw's Ansvar declarations listed coverage for a 1972 Chevrolet Monte Carlo and a 1976 American Motors Pacer. Because the Mustang was not one of the two autos "shown in the Declarations," coverage extended to the Mustang if Shaw acquired it either as a replacement vehicle or an additional vehicle during the policy period. If it was a *replacement* vehicle, Shaw need *not* ask Ansvar to insure it *unless* he wished to add or continue "Coverage for Damage to Your Auto." Otherwise, the replacement vehicle automatically had the same coverage as the vehicle it replaced. If it was an *additional* vehicle, it would have the broadest coverage provided for any vehicle shown in the Declarations *only* if Shaw asked Ansvar to insure it within 30 days after he became the owner.

■ Ansvar concedes the Mustang was acquired during the policy period. As to whether the Mustang was an additional vehicle or a replacement vehicle, Ansvar points out the simple act of purchasing a vehicle does not automatically place it in the category of a replacement vehicle. (*Comet Casualty Co. v. Holloman* (1983), 113 Ill. App. 3d 271, 274.) Rather, a five-part test has been applied to determine whether the purchase of a specific automobile generates automatic coverage under replacement-vehicle policy provisions: (1) the automobile must be acquired after the policy was issued; (2) the policy must not have expired before the acquisition; (3) the second vehicle must be acquired to replace the vehicle described in the policy, which vehicle (4) must either be disposed of or (5) be incapable of further service. *United Farm Bureau Mutual Insurance Co. v. Elder* (1981), 86 Ill. 2d 339, 343; *Comet*, 113 Ill. App. 3d at 274.

■ The object of the test is to fulfill the intention of the parties at the time they agreed to the policy (*i.e.*, to insure Shaw's two named autos, the Monte Carlo and Pacer) while at the same time recognizing that some sort of automatic continuous coverage is desirable in light of the frequency with which motor vehicles are bought and sold. (*United*

*Farm Bureau*, 86 Ill. 2d at 344.) The insured's intention in acquiring the vehicle, although clearly relevant, is not the sole determinant, nor is the operability of the named insured vehicle. *United Farm Bureau*, 86 Ill. 2d at 345-46.

■■■ A claimed lack of intention to utilize the vehicle as a replacement auto is not, as Ansvar argues, "fatal" to an insured's claim for automatic coverage of a vehicle as a replacement. Ansvar's reliance on *United Farm Bureau* for that proposition is misplaced. Referring to the case *Nationwide Insurance Co. v. Ervin* (1967), 87 Ill. App. 2d 432, the supreme court's opinion in *United Farm Bureau* included the statement: "There was evidence [in *Nationwide*] that the named insured had not intended to replace the named vehicle with the second car and so it could not be considered a replacement vehicle even if the named [insured] vehicle was inoperable." (*United Farm Bureau*, 86 Ill. 2d at 346.) A reading of *Nationwide* makes it clear that the "evidence" referred to by the supreme court in *United Farm Bureau* was the *objective* evidence of the insured's intent as revealed by all the facts and circumstances and not merely the insured's *subjective* intent. The insured in *Nationwide* testified, in fact, that he purchased the second car to replace the named insured vehicle. There was other direct and circumstantial evidence, however, which negated his stated intent. Consequently, the second car was determined not to be a covered replacement vehicle. 87 Ill. App. 2d at 434-37.

Applying the replacement vehicle test to the evidence at bar, it is undisputed the Mustang was acquired after the policy was issued and was in effect and that one of Shaw's two named insured vehicles, the 1976 Pacer, was "disposed of" when Shaw transferred title to it to Debra Maness on July 26, 1984. Relevant excerpts of Shaw's deposition testimony concerning the Mustang show he did not intend it to be a replacement vehicle for the Pacer:

"Q. Now, was this Mustang being used as a replacement vehicle for any of your—the other two automobiles that you had?

A. No.

Q. And the two automobiles that you previously testified that you had owned were operable and, in fact, were being used by the family at the time that you picked up the Mustang?

A. No, I didn't say they were operable, I don't think.

Q. Okay. Let me back up.

A. The Pacer was not much more than junk.

Q. Could you drive it down the road?

A. I don't think so. I think the transmission at that time was too bad.

Q. So the Pacer, the '76 American Pacer, on or about the time of the accident was inoperable because of the transmission?

A. I really don't remember whether we drove it. If we drove it, it was just local right there in Hebron.

Q. Was the Mustang going to be a replacement automobile; in other words, an automobile that you family members would use in place of the Pacer?

A. No. He wanted it—my son wanted the car just to work on. He wanted something to set in the garage and go out and play with and work on and fix up.

Q. So it was your intent to keep the Pacer, also?

A. No.

Q. You were going to get rid of the Pacer?

A. Yes. I gave it away.

&ast; &ast; &ast;

Q. And the Mustang was a vehicle, more or less a learning project, for your son—

A. (Interrupting) Yes.

Q. (Continuing)—to fix up and drive? Is that correct?

A. Yes."

In addition to this evidence of Shaw's subjective intent concerning the Mustang, there was undisputed evidence that the Mustang itself was inoperable and had been acquired in even exchange for Shaw's son's motorcycle, an uninsured "dirt bike" which his son played with around the house. There was further undisputed evidence that in addition to his other car, the 1972 Monte Carlo, Shaw had the unrestricted use of Evelyn Walters' 1977 Oldsmobile station wagon beginning late in June or early in July 1984 after his wife, Kathy, told Walters that he needed a car and might be interested in the station wagon which Walters was considering selling.

Applying the test to all this evidence, we conclude the Mustang was not a replacement vehicle and not automatically covered under the Ansvar policy. We further conclude it was not covered under the Ansvar policy as an additional vehicle.

As noted above, an additional vehicle is a covered auto "on the date you become the owner &ast;&ast;&ast; only if &ast;&ast;&ast; you acquire the vehicle during the policy period [and] &ast;&ast;&ast; you ask us to insure it within 30 days after you become the owner." It is undisputed the Mustang was acquired the same day the accident occurred and that this was during the policy period. As to whether he ever asked Ansvar to insure it, Shaw testified during his discovery deposition as follows:

"Q. Did you ever procure insurance for the '64 Mustang either before or after the accident?

A. It was '65.

Q. Or '65 Mustang either before or after the accident?

A. No.

Q. Was the Mustang totaled in the accident?

A. Yes.

Q. Following the accident did you notify your insurance company, Ansvar America, of your accident?

A. Yes.

Q. Do you recall when you did that, approximately? Was it soon after?

A. Yes.

Q. And how did you do that, by telephone?

A. Yes.

Q. Who did you call?

A. No idea. I have no idea.

MR. BROWN: I have no further questions."

Even assuming *arguendo* Shaw's report of this accident occurred within 30 days after he acquired the Mustang, there is no evidentiary material in the record which supports a finding that the accident report somehow amounted to a request for insurance on the Mustang. Shaw testified unequivocally that he never requested insurance for the Mustang, either before or after the accident, and that the Mustang was "junked" after the accident. Moreover, we note Shaw had a duty under his liability coverage with Ansvar "for the ownership, maintenance or use of *any* auto" (including Evelyn Walters' Oldsmobile) to report the accident promptly.

In sum, we conclude the court erred in finding as a matter of law that Ansvar must provide coverage for any damages occasioned by the Mustang since it was neither a "replacement" nor "additional" covered auto as provided in the policy.

We now turn to Country Casualty's cross-appeal from the court's judgment finding it liable for the damages occasioned by the involvement of the 1977 Oldsmobile station wagon. Country Casualty contends the court erred when it found: "Evelyn Walters intended to eventually give the Oldsmobile to Shaw, however, her intent had not finalized and the gift [had not] become complete prior to September 11, 1984." It argues that when Walters delivered possession of the Oldsmobile to Dennis Shaw she intended to and did give him whatever interest or right to receive she had in the Oldsmobile station wagon from her deceased husband's estate, and it was not necessary

for her to have received the letters testamentary or to have transferred the certificate of title to Shaw before the gift was complete.

Ansvar responds that although possession of the station wagon passed from Walters to Shaw, the gift of the car was not complete prior to the date of the accident because Walters did not possess the requisite donative intent when she relinquished possession to Shaw, nor did Shaw have exclusive dominion and control over the station wagon.

A "gift" is a voluntary, gratuitous transfer of property by one to another where the donor manifests an intent to make such a gift and absolutely and irrevocably delivers the property to the donee. (*In re Marriage of Cook* (1983), 117 Ill. App. 3d 844, 849.) The elements of a valid gift are donative intent, the donor's parting with exclusive dominion and control over the subject of the gift, and delivery thereof to the donee. (*Pocius v. Fleck* (1958), 13 Ill. 2d 420, 427-28; *Wencordic Enterprises, Inc. v. Berenson* (1987), 158 Ill. App. 3d 913.) Intent and delivery are separate elements of proof: that is, the fact delivery of the alleged gift has occurred is not conclusive as to whether a gift has been made. (*In re Marriage of Simmons* (1980), 87 Ill. App. 3d 651.) "Donative intent" is intention on the part of the donor that there be a present and irrevocable transfer of title to the subject matter of the gift; delivery of the subject matter of the gift is the means whereby the donative intent of the donor is given effect. (*Gordon v. Gordon* (1969), 113 Ill. App. 2d 191, 194.) To create a gift, there must be some communication, oral or written, of donative intent between donor and donee. (*In re Estate of Miller* (1973), 11 Ill. App. 3d 867.) A gift to a donee is not shown unless the donor has relinquished all present and future dominion and power over the subject matter of the gift. *In re Marriage of Cook*, 117 Ill. App. 3d at 849.

The question as to what constitutes a gift is one of law, and on the facts in the particular case, it involves a mixed question of law and fact. (38 Am. Jur. 2d *Gifts* §108 (1968).) To establish a gift, the proof must be clear and convincing, and the burden is upon the alleged donee to prove the existence of a donative intent in the donor. (*Schramm v. Schramm* (1958), 13 Ill. 2d 281, 288.) If different inferences can be drawn by a reasonable man from the facts in evidence, an issue of fact is considered to exist, and summary judgment must be denied. (*Williams v. Alfred N. Koplin & Co.* (1983), 114 Ill. App. 3d 482.) Where, however, the pleadings, depositions, and other evidence before the court show that at trial a verdict would have to be directed, entry of summary judgment is proper. *Pyne v. Witmer* (1989), 129 Ill. 2d 351; *Kennedy v. Joseph T. Ryerson & Sons, Inc.*

(1989), 182 Ill. App. 3d 914.

It is undisputed that Walters delivered possession of the station wagon to Shaw when he came to her house to pick it up late in June or early in July 1984. Previously, in May or June, Walters' husband died, and Shaw's wife, Kathy, helped her with some of her personal affairs. Dennis Shaw was the pastor of the church Walters attended for about seven years. When Kathy mentioned a youth group she would be taking on a trip to Virginia Beach, Walters suggested she use the 1977 Oldsmobile station wagon for the trip which was to be in June or early in July. Walters also mentioned to Kathy that she was thinking about selling the station wagon, and Kathy said her husband, Dennis, was in need of a car and to let him know of her desire to sell the station wagon. Walters subsequently flew to Atlanta, where her husband had resided, and picked up a new Thunderbird her husband had bought before he died.

Walters testified that when Shaw's wife mentioned Dennis' need for a car, she thought about it for a couple of weeks and decided to make the car a contribution to Dennis for use in his ministry. She did not tell Kathy about it right away; she stated she was very slow in moving, so she was contemplating it. She did not remember exactly when she decided to tell the Shaws they could have the car. When asked if she recalled telling Dennis that she had the station wagon just sitting at her house and that she wanted him to take it and use it and keep it running and then when the estate got finalized she would give it to him, Walters responded:

"A. Well, that was my intent.

Q. And your understanding of when the estate would be finalized is when your attorney would send you the testamentary letters; is that correct?

A. Yes.

Q. And then at that time you would give the car to Dennis Shaw; is that correct?

A. Yes."

Dennis Shaw stated that when Walters returned from Atlanta, she told him she was going to be driving the Thunderbird and would he please drive the station wagon "just to keep the battery up and whatever." On a Sunday late in June or early in July, Walters said to him: " 'I have a car and my car that's sitting up here is better than the car you have. Why don't you drive this car[?]' She made it seem as though she—I was doing her a favor to drive her car." He picked up the car at her house that day or the next day.

There was no conversation at the time he picked up the car re-

garding its use, and he never discussed who would provide insurance for the car while he was using it. His understanding was that it was her car and he was using it. It was also his understanding that she would provide insurance and he would provide gas. When he picked the car up, it had license plates on it, and he never changed them before the accident occurred. He offered to return the car to her several times. He testified he saw her every Sunday and would say to her, " 'Are you ready for your car to come back?' and she would say, 'Keep driving it' or 'No, I'm not.' " Shaw kept the car at his house and used it as he saw fit.

Walters testified she thought that when Dennis got the car he realized that she did not yet have her letters testamentary and that when she got them the car was going to be his. When asked: "And is it fair to say that you felt the vehicle was still yours prior to receiving your letters of [sic] testamentary?" she responded: "Well, now you get into a hard thing. In my heart it was his. I had given it to him. That was my intent and purpose, but legally it was—*** I didn't consider it had become legal until he had the title."

Dennis Shaw testified that the first time Walters told him that she was going to give the station wagon to him was two weeks or a month after the accident occurred, and she told him she would bring the title over. She did that, not too long after that time. Once he had title, Shaw procured insurance and license plates for the station wagon. Shaw had no independent recollection of when title was transferred, but the date of transfer shown on the title was February 14, 1985.

■■■ Country Casualty correctly points out, and Ansvar concedes, the rule in Illinois is that the gift of an automobile can be effected without going through the Secretary of State's office. A certificate of title is evidence of title, but it is not conclusive and one can own an automobile though the certificate of title is in the name of another. (*State Farm Mutual Automobile Insurance Co. v. Lucas* (1977), 50 Ill. App. 3d 894, 898.) It also correctly notes Walters' gift of the automobile to Shaw is not defeated merely by the fact she did not have her letters testamentary at the time she delivered possession of the car to Shaw since she needed no such letters to give to Shaw whatever interest she had in the station wagon, whether that interest was labeled an expectancy or a vested legal or equitable title. In *Poirot v. Gundlach* (1936), 284 Ill. App. 349, 354-56, the court wrote:

> "Every species of property, real and personal, legal or equitable, in possession, reversion or remainder, vested or contingent, incorporeal as well as corporeal, and including choses in action

may be the subject of a gift inter vivos." *Poirot*, 284 Ill. App. at 355.

■■■ We agree with Ansvar that the evidence before the court clearly showed Evelyn Walters' delivery of possession of the station wagon to Dennis Shaw was not accompanied by the requisite *present* donative intent, nor did she relinquish exclusive dominion and control over the station wagon to Shaw.

Although she decided at some uncertain point that she would contribute the station wagon to Shaw for use in his ministry, she believed, albeit incorrectly, that she could not do this before she had her letters testamentary, and she never communicated to Shaw her intent to give him the car until after the accident occurred. The evidence shows the posture assumed by both Shaw and Walters was that Walters was still the owner of the station wagon and had the power to terminate Shaw's use of the car at her discretion. Walters' acknowledgment of the reservation of this right in herself, including the facts that she maintained the insurance and the license plates on the car, is contrary to a finding that she had relinquished all present and future dominion and power over the subject matter of the gift to Shaw.

We conclude the court did not err in finding that Walters had not made a gift of the station wagon to Shaw prior to the date of the accident. Accordingly, we affirm the court's summary judgment that Country Casualty must provide coverage for those damages occasioned by the involvement of Walters' station wagon.

For the reasons above, the judgment of the circuit court of McHenry County is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

REINHARD and WOODWARD, JJ., concur.