No. 2--05--0584                    filed 4/28/06

_____

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

_____

| | | |
|---|---|---|
| <u>In re</u> MARRIAGE OF | ) | Appeal from the Circuit Court |
| PAULA L. TEGELER, n/k/a Paula L. James, | ) | of Ogle County. |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 99--D--54 |
| | ) | |
| VIRGIL SCOTT TEGELER, | ) | Honorable |
| | ) | Kathleen O. Kauffmann, |
| Respondent-Appellee. | ) | Judge, Presiding. |

_____

_____

JUSTICE BOWMAN delivered the opinion of the court:

Petitioner, Paula L. Tegeler, n/k/a Paula L. James, appeals from the trial court's orders relating to child support due from respondent, Virgil Scott Tegeler. On appeal, she argues that the trial court erred: (1) by ruling that a May 23, 2002, order was final; (2) by denying her petition, pursuant to section 2--1401 of the Code of Civil Procedure (735 ILCS 5/2--1401 (West 2004)), requesting child support retroactive to August 1999; (3) in calculating respondent's income; (4) by disallowing interest on back child support; and (5) by denying her attorney fees. We affirm in part, reverse in part, and remand.

## I. BACKGROUND

Petitioner and respondent were married on September 19, 1981. They had two children during their marriage: Virgil Kyle (Kyle), born July 10, 1986, and Daniel Paul, born July 1, 1989.

The parties' marriage was dissolved on February 24, 2000, and an order dated May 23, 2002, addressed child custody, support, and property issues. The order incorporated the parties' agreement that, although petitioner would be the children's physical custodian, the children would equally divide their time with the parties. It also incorporated the parties' agreement that they would share the children's expenses and that there would be no exchange of child support.

**[Nonpublishable material under Supreme Court Rule 23 removed here.]**

The order was prepared by petitioner's attorney and approved, as to its form, by respondent's attorney. Although the order states that a joint parenting agreement would be filed with the order, no such agreement was attached or subsequently filed.

Over 1½ years later, on January 5, 2004, petitioner filed a petition to enter a joint parenting agreement or joint parenting order, and to determine child support. On January 28, 2004, petitioner filed a "Motion to Determine Child Support Arrearage." On February 25, 2004, the trial court ruled that the May 23, 2002, order was final, and that petitioner's pending motions would be treated as requests for modification.

Petitioner filed a petition to modify child support on March 2, 2004. On April 2, 2004, she filed a motion to compel respondent to comply with discovery, and the motion was granted on April 15, 2004. Respondent was ordered to respond to petitioner's written discovery requests by May 15, 2004. On May 21, 2004, petitioner filed a section 2--1401 petition, requesting, among other things, that she be awarded child support retroactive to August 1999, when she and the children allegedly left the marital home. She also moved for sanctions based on respondent's failure to answer discovery. On May 27, 2004, the trial court granted petitioner's motion for sanctions but reserved its ruling on the issue of the amount of attorney fees to be awarded. On June 24, 2004, it entered a mittimus order of indirect civil contempt against respondent; respondent purged the order on July 1, 2004, by fully responding to discovery.

On August 24, 2004, the trial court entered a joint parenting order granting the parties joint legal custody of Daniel, with petitioner continuing as the physical custodian (Kyle had since reached the age of majority). Respondent was to have visitation with Daniel three weekends per month during the school year and every other week during the summer.

The trial court conducted hearings on the issue of child support on October 14, 2004, and April 1, 2005. The trial court heard the testimony of the parties as well as of petitioner's expert, a certified public accountant with a farming background. The testimony revealed that petitioner is employed as a "postmaster" in a post office, while respondent is a farmer whose sole income comes from farming.

During the hearings, the trial court stated that, for child support purposes, it would consider respondent's income over the three-year period of 2002 through 2004. Respondent's federal tax returns show that in 2002, he reported $441,614 in income and $427,485 in expenses (including $39,573 for depreciation), and paid $1,656 in taxes. In 2003, he reported $487,971 in income and $468,537 in expenses (including $33,486 for depreciation), and paid $2,422 in taxes. In 2004, respondent reported $528,456 in income and $514,648 in expenses (including $55,230 for depreciation), and paid taxes of $1,611. Thus, for federal tax purposes, respondent showed a net income of $14,129 in 2002, $19,434 in 2003, and $13,808 in 2004.

The trial court orally denied petitioner's section 2--1401 petition on April 1, 2005. The same day, it requested that the parties submit their closing arguments in writing. On May 10, 2005, the trial court issued a written order. On the issue of child support, it stated:

"For the months from January through July, 2004, although the children spend one-half of the time with [respondent] and therefore it could be argued that no child support should go either way, given that [respondent] earns more money than [petitioner] earns, the Court calculates a fair amount of child support for each of those months to be $250.00 per month,

with the total amount owed for the months of January through July, 2004 being $1750.00. Beginning in August, 2004, the child support shall be set at 20%, calculated without depreciation, and with the custody change effective in August, 2004, in the amount of $945.00, until [Daniel] reaches the age of majority. The total amount from August 2004 through May 2005 is $9450.00. The total 'arrearage' is $11,200.00."

The trial court ordered respondent to pay $945 a month in child support beginning in June 2005, plus an additional $300 per month toward the $11,200 arrearage. It stated that the back child support was not a true arrearage that would accrue interest, because the court had not previously ordered respondent to pay child support.

The trial court did not provide a calculation showing how it determined respondent's net income, but the $945 figure it used for child support beginning in August 2004 corresponds to alternative calculations set forth in respondent's written closing argument. Although respondent argued that the trial court should consider depreciation expenses when determining his income, he also included calculations that did not subtract depreciation. According to these latter calculations, which correspond to the information in respondent's tax returns, he had a "net income" of $52,046 in 2002; $50,498 in 2003, and $67,427 in 2004. Averaged over three years, 20% of that income, representing support for one child, results in monthly payments of $944.28.

Regarding the issue of attorney fees, the trial court awarded petitioner $2,500 based on its previous finding of contempt against respondent. However, it denied her request for attorney fees relating to the balance of the proceedings. Petitioner timely appealed.

## II. ANALYSIS

We initially note that respondent has not filed a brief on appeal. However, we will address the issues presented based upon the principles set forth in First Capitol Mortgage Corp. v. Talandis Construction Corp., 63 Ill. 2d 128, 133 (1976).

The material in sections A. and B. is nonpublishable under Supreme Court Rule 23.

**[Nonpublishable material under Supreme Court Rule 23 removed here.]**

## C. Respondent's Income

Petitioner argues that "the trial court erred by not properly setting forth its calculation of statutory income for purposes of establishing child support in deviation from the Guidelines."  We agree that a trial court must state reasons for deviating from the child support guidelines listed in section 505(a)(1) of the Illinois Marriage and Dissolution of Marriage Act (Marriage Act) (750 ILCS 5/505(a)(1) (West 2004)).  See 750 ILCS 5/505(a)(2) (West 2004).  However, the trial court's child support award for August 2004 onward reflects figures set forth by respondent in his written closing argument, which he presented as conforming to the guidelines.  Thus, the issue we must address is whether the trial court properly calculated respondent's income under section 505(a)(3) of the Marriage Act (750 ILCS 5/505(a)(3) (West 2004)).[1]  The modification of child support payments is within the trial court's sound discretion, and we will not disturb its decision absent an abuse of discretion.  In re Marriage of Rogers, 213 Ill. 2d 129, 135 (2004) (Rogers II); see also In re Marriage of Sawicki, 346 Ill. App. 3d 1107, 1119 (2004) (the trial court's findings as to net income are reviewed under an abuse of discretion standard).  However, issues of statutory interpretation present questions of law, which we review de novo.  Rogers II, 213 Ill. 2d at 135-36.

---

[1]We address the trial court's child support award for January to July 2004 later in our opinion.

Section 505(a) sets the minimum amount of child support at 20% of the payor's "net income" for one child and 28% of that income for two children, unless the trial court finds that the guidelines are inappropriate in the case before it. 750 ILCS 5/505(a)(1), (a)(2) (West 2004). Section 505(a)(3) defines "net income" as "the total of all income from all sources," minus deductions for state and federal income tax, social security, mandatory retirement contributions, union dues, health insurance premiums, prior obligations of support or maintenance, "[e]xpenditures for repayment of debts that represent reasonable and necessary expenses for the production of income," necessary medical expenditures, and "reasonable expenditures for the benefit of the child and the other parent, exclusive of gifts." 750 ILCS 5/505(a)(3) (West 2004).

Petitioner argues that the trial court should not have subtracted respondent's day-to-day operating expenses when determining his net income because such expenses do not qualify as "[e]xpenditures for repayment of debts that represent reasonable and necessary expenses for the production of income." 750 ILCS 5/505(a)(3)(h) (West 2004). Exclusive of depreciation, respondent claimed expenses of $387,912 in 2002, $435,051 in 2003, and $459,418 in 2004. Petitioner claims that respondent presented no evidence that such expenses went toward the repayment of debts or that they represented reasonable and necessary expenses for his income production.

Petitioner cites Gay v. Dunlap, 279 Ill. App. 3d 140 (1996). There, the father was self-employed as a realtor through Coldwell Banker. Gay, 279 Ill. App. 3d at 150 (Cook, J., concurring in part and dissenting in part). His federal tax return listed his gross income as $31,703, and his schedule C listed $10,500 for advertising and car expenses (including the lease of a vehicle) and $1,075 in expenses for things such as depreciation, legal and professional services, office expenses, supplies, meals, and entertainment. Gay, 279 Ill. App. 3d at 150 (Cook, J., concurring in part and dissenting in part). The father asked that these amounts, along with his tax payments, be subtracted

from his gross income to determine his net income for child support purposes. Gay, 279 Ill. App. 3d at 142. The trial court agreed, but the appellate court reversed, holding that money spent on gas, auto repairs, and insurance premiums, as well as the $1,075 in expenses, should not have been subtracted, because they were not expenses for the repayment of debts. Gay, 279 Ill. App. 3d at 145. The appellate court remanded the case for a hearing on whether the automobile lease represented a reasonable and necessary expense for income production. Gay, 279 Ill. App. 3d at 149.

We believe that Gay is distinguishable from the instant case. As Justice Cook pointed out in his partial concurrence and partial dissent, the father's $31,703 gross income was actually a net figure, in that it excluded commissions taken by Coldwell Banker. Gay, 279 Ill. App. 3d at 150 (Cook, J., concurring in part and dissenting in part). Furthermore, although the father was self-employed, Justice Cook characterized his relationship to Coldwell Banker as similar to that of an employee to an employer. Gay, 279 Ill. App. 3d at 150 (Cook, J., concurring in part and dissenting in part). Justice Cook recognized that section 505(a)(3) of the Marriage Act could be "troublesome" for more traditionally self-employed people:

"It seems clear there are obvious deductions which are not listed. For example, how is net income calculated for a merchant engaged in the sale of goods? Under section 505(a)(3) the court must begin with the total of the merchant's receipts from sales. Can there be a deduction for cost of goods sold? The only listed deduction which might apply is section 505(a)(3)(h), but that seems overly restrictive. There should be a deduction for cost of goods sold even if the merchant pays cash for them, even if there is no 'repayment of debts,' and even if the expense is a continuing one. I conclude the legislature intended to allow such obvious deductions even without specific language in section 505(a)(3). In the present case, for example, [the father] was not required to include the total commissions he earned and was entitled to a credit for the share taken by Coldwell Banker, including amounts it paid for

-7-

his office expenses." Gay, 279 Ill. App. 3d at 151 (Cook, J., concurring in part and dissenting in part).

We believe that a solution to this problem lies within the construction of the word "income" in section 505(a)(3). As stated, that section defines "net income" as "the total of all income from all sources" (emphasis added) minus enumerated deductions. 750 ILCS 5/505(a)(3) (West 2004). The statute does not define "income," but our supreme court has held that it means " 'something that comes in as an increment or addition ***: a gain or recurrent benefit that is usu[ually] [sic] measured in money ***: the value of goods and services received by an individual in a given period of time' " and " '[t]he money or other form of payment that one receives, usu[ually] [sic] periodically, from employment, business, investments, royalties, gifts and the like.' " Rogers II, 213 Ill. 2d at 136-37, quoting Webster's Third New International Dictionary 1143 (1986) and Black's Law Dictionary 778 (8th ed. 2004). This court has stated that income represents a gain or profit that is generally understood to be a return on an investment of labor or capital, thereby increasing the recipient's wealth. In re Marriage of Worrall, 334 Ill. App. 3d 550, 553-54 (2002).

As respondent's wealth is increased only by his gross farm revenues minus his day-to-day operating expenses, we conclude that the trial court properly adopted respondent's use of this figure as his "income" before subtracting the deductions specifically listed in section 505(a)(3). See also In re Marriage of Nelson, 297 Ill. App. 3d 651, 656 (1998) (appellate court affirmed the trial court's computation of the father's net income, in which the trial court deducted farm operating expenses appearing on schedule F of father's tax return). We note that the trial court specifically disallowed any reductions for depreciation.[2] Petitioner's construction of the statute would result in imputing to

---

[2]As respondent has not filed a cross-appeal in this case, we express no opinion as to whether the child support guidelines require that the trial court disallow depreciation expenses.

respondent several hundred thousand dollars of income that he does not actually possess, and we believe the legislature did not intend such an unjust result. See In re Mary Ann P., 202 Ill. 2d 393, 406 (2002) (courts should construe statutes in a way that avoids absurd, unreasonable, unjust, or inconvenient results); cf. Rogers II, 213 Ill. 2d at 137 (cash gifts received by the father considered income because they "represented a valuable benefit to the father that enhanced his wealth and facilitated his ability to support" his child); In re Marriage of Freesen, 275 Ill. App. 3d 97, 104 (1995) (trial court did not err by excluding from the respondent's net income passive income that he did not actually receive).

Petitioner relies on several other cases in addition to Gay, but they are also distinguishable. In In re Marriage of Ackerley, 333 Ill. App. 3d 382, 390 (2002), this court cited Gay for the proposition that expenditures for the production of income are not deductible if they do not represent a repayment of a debt. We do not disagree with this statement as it pertains to the deduction enumerated in section 505(a)(3)(h) (750 ILCS 5/505(a)(3)(h) (West 2004)), and the Ackerley court did not address a situation in which the respondent was self-employed. In re Marriage of Lefler, 185 Ill. App. 3d 677, 684 (1988), is distinguishable because, there, the respondent sought to deduct indebtedness arising out of a tax lien and attorney fees accessed against his business, which was no longer in existence during the period in question. Here, in contrast, respondent's farming operation is ongoing. In In re Marriage of Dwan, 108 Ill. App. 3d 808, 813 (1982), another case cited by petitioner, the respondent, a physician, sought to subtract from his income calculation portions of the cost of 11 business trips, depreciation on his car and home office, " 'one-time-only' " deductions, and a salary to a woman with whom he lived. The appellate court concluded that the trial court could have reasonably found that the respondent had more income available to him than the amount he claimed. Dwan, 108 Ill. App. 3d at 813. Dwan is inapposite to this case, as the trial court here

disallowed depreciation expenses and there is no indication that respondent's business expenses were questionable.

Our analysis is supported by this court's decision in Worrall, 334 Ill. App. 3d 550. There, the respondent was a truck driver who received a base salary plus a per diem payment designed to cover his food and lodging expenses while he was on the road. The trial court excluded the per diem from his income when calculating child support. Worrall, 334 Ill. App. 3d at 552. On appeal, this court stated that while the respondent's per diem was nominally for meals and lodging, the respondent could actually use the money for whatever purpose he chose. We held that per diem allowances for travel expenses will generally constitute income for child support purposes but that the income "is subject to reduction to the extent that the child support payer can prove that the per diem was used for actual travel expenses and not for his or her economic gain." Worrall, 334 Ill. App. 3d at 555. Under petitioner's method of calculating income, however, such reductions would not be possible, as travel expenses do not constitute expenditures for the repayment of debt or fall within any other enumerated deduction under section 505(a)(3).

Petitioner further argues that although respondent testified that his farm expenses were reasonable and necessary, he failed to produce any receipts substantiating such expenses. However, the schedule Fs to respondent's tax returns show itemized totals of expenses, and his farm account books show very detailed lists of expenditures complete with dates, check numbers, payees, descriptions of items, and amounts paid. We conclude that such evidence constituted a prima facie showing that such expenses were legitimate, and petitioner failed to rebut it.

We recognize that section 505(a)(2) allows the trial court to deviate from the guidelines if it finds them to be inappropriate after considering, among other things, the "financial resources and needs of the non-custodial parent." 750 ILCS 5/505(a)(2)(e) (West 2004). Thus, an argument could be made that respondent's net income should be determined under section 505(a)(3) without

consideration of his day-to-day operating expenses, because the trial court would still be free to take such costs into account in a decision to deviate from the guidelines. However, as Justice Cook stated in Gay, "The guidelines are valuable because they provide a definite figure in most cases, among other things saving the time of the parties and the courts. The guidelines will lose that value if courts routinely go beyond them." Gay, 279 Ill. App. 3d at 152 (Cook, J., concurring in part and dissenting in part).

We now turn to petitioner's argument that respondent's "line of credit is a resource for purposes of child support." Petitioner maintains that because respondent receives annual loans from the bank, the following lines of credit should be counted as income to respondent: $460,000 in 2002; $650,000 in 2003; and $660,000 in 2004.

A "line of credit" is the "maximum amount of borrowing power extended to a borrower by a given lender, to be drawn upon by the borrower as needed." Black's Law Dictionary 941 (7th ed. 1999). Petitioner does not cite, nor does our research reveal, any authority for the proposition that lines of credit should be considered as income under section 505(a)(3). Such an argument is also unreasonable given that lines of credit represent loans available to an individual rather than money the individual actually receives. As such, we conclude that the trial court did not abuse its discretion by not considering respondent's lines of credit as income.

Still, we recognize that at least one court has held that loan proceeds are to be considered income under section 505(a)(3). See In re Marriage of Rogers, 345 Ill. App. 3d 77, 80 (2003), aff'd on other grounds, 213 Ill. 2d 129 (2004) (Rogers I). In Rogers I, the father received money from family members that the trial court characterized as gifts and loans. The father argued that such funds should not be considered in calculating his income for child support purposes, but the appellate court disagreed, holding that both gifts and loans are income. Rogers I, 345 Ill. App. 3d at 79-80. In concluding that loans are income, the court reasoned that under section 505(a)(3), there is

a rebuttable presumption that all income is income for child support purposes, unless specifically excluded, and that the guidelines provided only for the deduction of "expenditures for repayment of debt" and not for the deduction of loan proceeds. Rogers I, 345 Ill. App. 3d at 80. On appeal, the supreme court affirmed the appellate court's decision, on the grounds that monetary gifts are to be considered income for child support and that all of the funds in question constituted gifts. Rogers II, 213 Ill. 2d at 137. The supreme court did not reach the issue of whether loans would qualify as income under section 505(a)(3). Rogers II, 213 Ill. 2d at 140.

We believe that, in general, loans should not be considered income. We note that the Black's Law definition of "income" quoted by the supreme court in Rogers II, cited earlier in our opinion, specifically includes gifts as income but does not mention loans. Rogers II, 213 Ill. 2d at 137. More significantly, loans typically should not be counted as income because they usually do not directly increase an individual's wealth. See Worrall, 334 Ill. App. 3d at 553-54; cf. Rogers II, 213 Ill. 2d at 137 (monetary gifts considered income to the father because they increased his wealth and ability to support his child). In this case, for example, there is no evidence that respondent used his loans for anything other than farming purposes. To the extent that the loans allowed him to earn a living or enhance his production, respondent's farming income has already been included in his income calculation. Although it could be considered unfair in this situation not to count as income annual loans potentially reaching over $600,000, while allowing for a corresponding deduction for repayment of the loans, it appears that neither the loans nor the repayments were considered in respondent's income calculation.

A contrary interpretation that includes loans as income would often create unjust or absurd results. Building on Justice Cook's example in Gay, if a merchant borrows $500,000 to buy equipment for his business and is to repay the loan over a 10-year period, even a three-year income averaging approach would attribute much more "net income" to the merchant than the funds he

actually possesses. Other scenarios create even more nonsensical results. Should a parent who takes out tens of thousands of dollars in student loans for graduate school be credited with an equal amount of "income" for those years? Should a parent who borrows hundreds of thousands of dollars for a mortgage to buy a house be considered to have that much additional "income" that year? In the mortgage example, even the comparatively small monthly mortgage payments could not be deducted from the inflated income, for a home mortgage is not an expense that produces income (see 750 ILCS 5/505(a)(3)(h) (West 2004)) nor does it fall within any other enumerated deduction.

Again, we acknowledge that, arguably, loans could be considered as income but still serve as a basis for the trial court to deviate from the guidelines under section 505(a)(2)(e). However, the same rationale we applied for day-to-day operating expenses applies here: if the trial court must routinely deviate from the guidelines, the guidelines lose much of their value. We emphasize that although we hold that loans should generally not be considered income under section 505(a)(3), there may be situations where it is appropriate to do so. Such a situation is not present in this case, however, and the trial court did not err by not including respondent's loans in its income calculation.

Petitioner next argues that the trial court erred by not including deferred grain sales in its calculation of respondent's income. Petitioner maintains that respondent "produces a grain crop of which approximately $200,000 ([i.e.] about half of the crop) is held over for tax purposes until the following year ([i.e.] it is available as a resource for child support but not recognized for taxes until sold in the following year)" and that "this extra $200,000, which arises from annual production, is always placed a year ahead as an annual deferral, which will not be recognized until the farmer dies or goes out of business."

Petitioner's argument is not persuasive. While deferred grain sales could cause respondent's income to fluctuate from year to year, the trial court accounted for these differences by averaging respondent's income over a three-year period. See Nelson, 297 Ill. App. 3d at 655 (where supporting

˘13˘

parent's income fluctuates, it is reasonable for trial court to average income for previous three years to determine child support). Petitioner counters that averaging does not properly account for such differences and sets forth the following scenario:

"[I]f the farmer's crop is 100 beans in year 1 and he defers 50 beans to year 2; [sic] in year 2 the farmer does not necessarily end up with 150 beans of recognized IRC income ([i.e.] 50 beans deferred from year 1 and 100 beans from the year 2 crop with 50 beans again being deferred into year 3). The fallacy arises in the fall of year 2 because the smart farmer will store most or all of his crop (and if necessary expand his storage capacity, like [respondent] did in 2003) in order to avoid selling the grain in the current year (farmers, like [respondent], who have assets and large lines of credit extend that credit in the fall to increase their expenses while deferring the grain sale). As U.S. taxpayers only pay tax one year at a time, the stored grain is always deferred into the future (which is not currently subject to tax). ***
When the next future [sic] year arises, the farmer then times his grain sales to create new losses, because he knows how much he needs to sell in order to both break even on cash flow and run a loss for taxes."

Petitioner maintains that the farmer could accumulate net operating losses, to be carried forward from year to year, and, once they accumulate, sell the grain so that the farmer shows little or no income for tax purposes for that year.

Petitioner's scenario is unconvincing because it does not recognize that in year 1, which in this case would be 2002, respondent was also selling grain deferred from the previous year. Respondent was not storing a single year's crop for years at a time; respondent testified that he sold grain at irregular intervals, from every "couple of months" to every six months. Even petitioner's expert testified that crops could be stored only as long as their "quality" could be maintained and that, therefore, crops are typically sold within 12 to 18 months of being harvested. The expert also

agreed that respondent had sold all of his 2002 crops in both 2002 and 2003, with the exception of about 10,000 bushels. As petitioner estimates that respondent's average yearly harvest is about 178,650 bushels, 10,000 bushels is not a significant portion of the crop and, in any event, would be accounted for by averaging respondent's income over a period of time. Furthermore, although respondent could time the sale of some of the grain to take advantage of tax laws, it would not "distort" his net income as defined by section 505(a)(3); the court would still begin by considering his total income for that year and would subtract only the deductions enumerated by the child support guidelines. See Rogers II, 213 Ill. 2d at 137 (Internal Revenue Code does not dictate what constitutes "income" under the statutory child support guidelines). Notably, there is no indication that respondent was somehow timing his grain sales to evade child support obligations. Thus, we conclude that the trial court did not abuse its discretion by not including respondent's unsold grain in its income calculation.

Petitioner next argues that the trial court erred by not including as income the average amount of money respondent deposited into his checking account. Petitioner maintains that bank records show that respondent spent an average of $72,000 per year from 2002 through 2004 on personal items, ski trips, restaurants, and cash withdrawals. According to petitioner, respondent testified that he did not write checks from his farm account to his personal account. Petitioner contends that because respondent never explained how his checking account was funded, the money deposited there should be considered an additional resource for the purpose of computing child support.

According to the record, respondent testified that it was his general business practice not to write himself checks from the farm bank account and deposit them into his personal checking account. However, he later clarified that his only income came from farming and that, in order to have money to live on, he deposited money from the sale of things like grain and cattle into his

checking account. Respondent testified that although he did not first put the money into his farm bank account in such situations, he recorded the sales' proceeds in his farm account books. Thus, respondent partially explained the source of funding for his checking account. However, to the extent that respondent's personal spending exceeded his "net income" of $50,000 to $70,000 per year, we agree that the source of such money is unexplained and should be considered as an additional resource for child support. In arriving at our conclusion, we emphasize that respondent testified that his checking account was funded solely from farming proceeds and not, for example, from loans. We also note that the unexplained funds do not appear to have been carried over from prior years' savings; according to bank statements in the record, respondent's checking account had a balance of $844.25 on January 15, 2002. Of course, any checks that correspond to the deductions allowed in section 505(a)(3) or to documented expenditures for the farm should not be included as unexplained resources, because they have already been taken into account in calculating respondent's net income. Therefore, we reverse the trial court's calculation of child support and remand the case to the trial court for a hearing on this issue.

Finally, we address the trial court's award of child support from January to July 2004. The trial court stated that because the children were spending equal amounts of time with the parties during that period, "it could be argued that no child support should go either way." However, based on its finding that respondent earns more money than petitioner, it calculated "a fair amount" of child support to be $250 for each of these months. The trial court apparently decided to deviate from the child support guidelines for January to July 2004 because the parties shared equal time with the children. Petitioner has not argued that this was an improper reason for a downward deviation, so we do not address this issue on appeal. See Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001 (points not argued are waived). However, if

˘16˘

respondent's income calculation changes upon remand, the trial court should also revisit the issue of child support for January to July 2004.

D. Interest on Child Support Arrearage

Petitioner additionally argues that the trial court erred by denying her interest on back child support. As stated, the trial court ordered respondent to pay a total of $11,200 in child support for January 2004 through May 2005. Respondent was to satisfy this obligation through monthly payments of $300. The trial court stated that the back child support did not represent a true arrearage that would accumulate interest, because respondent had not previously been ordered to pay child support.

Petitioner maintains that she is entitled to 9% interest on the retroactive child support pursuant to section 505(b) of the Marriage Act, which states, in relevant part:

> "A support obligation, or any portion of a support obligation, which becomes due and remains unpaid for 30 days or more shall accrue simple interest at the rate of 9% per annum." 750 ILCS 5/505(b) (West 2004).

The interpretation of a statute presents a question of law, which we review de novo. In re Christopher K., 217 Ill. 2d 348, 364 (2005).

The primary rule of statutory construction is to give effect to the legislature's intent. King v. First Capital Financial Services Corp., 215 Ill. 2d 1, 26 (2005). The best indication of that intent is the statute's language, which should be given its plain and ordinary meaning. King, 215 Ill. 2d at 26. Here, section 505(b) imposes 9% interest on any child support obligation that "becomes due and remains unpaid for 30 days or more." 750 ILCS 5/505(b) (West 2004). As petitioner was not entitled to the back child support until the trial court awarded her such support on May 10, 2005, it logically follows that it cannot be considered an overdue obligation.

˘17˘

Moreover, there is no indication that respondent has, since that time, failed to pay the required support amounts.

Petitioner cites In re Marriage of Thompson, 357 Ill. App. 3d 854 (2005). In Thompson, the respondent was found in contempt of court for failing to pay $36,940.20 in accumulated child support obligations, and he was ordered to pay the arrearage in monthly installments. The arrearage judgment was subsequently modified to $30,990.20. Thompson, 357 Ill. App. 3d at 855. Many years later, the respondent moved to terminate the installment payments on the basis that he had fully paid the arrearage. In response, the Department of Public Aid sought and successfully obtained 9% interest on the arrearage judgment. Thompson, 357 Ill. App. 3d at 855-56. On appeal, the respondent argued that, because he was ordered to pay the arrearage judgment in monthly installments and he did not miss any installment payments, no interest should have accrued on the judgment. Thompson, 357 Ill. App. 3d at 856-57. This court disagreed, holding that, among other things, under section 505(b) of the Marriage Act, "interest on unpaid child support begins to accrue 30 days after the missed payment's original due date." Thompson, 357 Ill. App. 3d at 861. We rejected the respondent's argument that an arrearage judgment for overdue child support causes interest to stop accruing on the original support obligation. Thompson, 357 Ill. App. 3d at 861. Thompson is inapposite to this case, as the respondent in Thompson was ordered to make monthly installment payments to satisfy an arrearage of child support that resulted from his failure to pay court-ordered obligations. Here, in contrast, the retroactive child support does not represent any overdue amounts, so we agree with the trial court that it should not accumulate interest.

E. Attorney Fees

The material in this section is nonpublishable under Supreme Court Rule 23.

[**Nonpublishable material under Supreme Court Rule 23 removed here.**]

III. CONCLUSION

˘18˘

For the foregoing reasons, we affirm the Ogle County circuit court's judgment in all respects except as it relates to its failure to consider any <u>unexplained</u> funds in respondent's checking account as a source of income for child support purposes. On this issue, we reverse the trial court's judgment and remand the cause for further hearings. If the trial court attributes a greater income to respondent than it did previously, it should revisit its rulings regarding the proper amount of child support for both January to July 2004, and August 2004 onwards. If the trial court determines that it is appropriate to deviate from the guidelines, it must still state the amount of support that would have been required under the guidelines, as well as its reason or reasons for the deviation. See 750 ILCS 5/505(a)(2) (West 2004).

Affirmed in part and reversed in part; cause remanded with directions.

GROMETER, P.J., and CALLUM, J., concur.