2017 IL App (2d) 160604
No. 2-16-0604
Opinion filed July 13, 2017
Modified upon denial of rehearing October 6, 2017

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| AMY M. BRILL, | ) | of McHenry County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| and | ) | No. 15-DV-73 |
| | ) | |
| RANDY L. BRILL, | ) | Honorable |
| | ) | Christopher M. Harmon, |
| Respondent-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLAREN delivered the judgment of the court, with opinion.
Presiding Justice Hudson and Justice Jorgensen concurred in the judgment and opinion.

**OPINION**

¶ 1   Respondent, Randy L. Brill, appeals from the McHenry County circuit court's judgment for dissolution of his marriage to petitioner, Amy M. Brill. Randy argues that the trial court erred by (1) miscalculating Amy's annual gross income for purposes of maintenance, (2) incorrectly applying the statutory guidelines in calculating maintenance, (3) failing to impute income to Amy for purposes of maintenance, (4) classifying as marital property Randy's interest in a house he bought with his girlfriend, and (5) valuing Randy's interest in the house he bought with his girlfriend and awarding Amy half that amount. For the following reasons, we affirm as modified.

¶ 2                                I. BACKGROUND

¶ 3     In July 1992, Amy and Randy were married in McHenry County.  On January 30, 2015, Amy filed a petition for dissolution of marriage.  When Amy filed her petition, their son was 22 years old and their daughter was 25 years old.  On May 17 and 18, 2016, the trial court heard testimony and received into evidence numerous exhibits.  After the hearing, the trial court distributed the parties' marital and nonmarital property and awarded Amy maintenance in the amount of $1,840 a month for 96 months.

¶ 4     At the hearing, Amy testified as follows.  She suffered from many health problems, having been diagnosed with diabetes, hypertriglyceridemia, Barrett's esophagus, hypertension, hypercholesterolemia, and partial lipodystrophy.  Amy had been diabetic for 20 years and used an insulin pump.  Her diabetes caused additional medical problems, including neuropathy, high blood pressure, diabetic retinopathy, and portal vein hypertension.  In 2014 Amy was hospitalized twice, for pancreatitis and hypertriglyceridemia, for 9 or 10 days in May and for two weeks in December.  During the December hospitalization, she was in the intensive care unit.  Due to her illnesses, Amy was prescribed and took five medications daily.

¶ 5     Amy testified that she earned $23,000 a year at her current job, at Mercy Health Systems.  She worked between 32 and 37 hours a week and occasionally worked overtime.  Amy could not work more hours and take care of her health.  Amy's biweekly paystubs dated March 31, April 14, and April 28, 2016, were admitted into evidence, showing gross wages of approximately $1,041, $1,260, and $1,033, respectively.  Amy's paystubs also showed that she was paid an hourly rate of $13.61.  Amy's April 28, 2016, paystub showed year-to-date gross wages of $9,006.

¶ 6      Amy began working at Mercy Health Systems in July 2015.  Before that, she worked at the Family Practice Center, in billing.  Amy worked at the Family Practice Center from July 2014 until the day after Christmas 2014, at an annual salary of $40,000.  Amy was "terminated" two weeks after her hospitalization in December 2014, because she "couldn't learn the computer system like they expected" her to, and, while she was in the hospital, "they outsourced her job." So, when Amy returned to work, her job was "no longer a full-time position."

¶ 7      Before working at the Family Practice Center, Amy worked at Spinal Sports Rehab for 8 to 10 years, until she was terminated in June 2014, two weeks after she was hospitalized.  Amy did the billing and, when she was hospitalized, "the billing just basically stopped," so her employer "outsourced" the billing and terminated Amy.

¶ 8      Amy was content to stay at her current job because "they provide good health insurance, which I've never had on my own before."  The other practices Amy worked for did not offer health insurance benefits.  Amy was currently covered by Randy's health insurance.  If she continued to work at Mercy, she could obtain health insurance as an employee.  Amy paid for disability insurance through Mercy.

¶ 9      Amy received $1,000 a month in temporary maintenance from Randy.  For approximately the past two years, beginning about mid- to late 2014, she was "short" in paying her bills by about $1,000.  Her medications cost about $300 a month.  Amy's hospital bills were "astronomical" and, although she made small payments on them, most of them were in collection.  Because she needed a special diet due to her illnesses, her grocery bill was about $800 a month.  Amy's parents helped pay her bills, including for rent, medications, a new insulin pump, travel to Iowa to attend the parties' son's  graduation, work uniforms, moving expenses, and groceries.  Amy's parents did not support Amy while she and Randy were "together."  Amy

did not think that she could get a job making more money, because she did not know the new billing and medical-coding systems and she could not work more hours while taking care of her health. At her current job at Mercy, Amy was a receptionist.

¶ 10    During cross-examination, Amy testified that she owed her parents "a lot of money." The "debts" section of her financial affidavit, however, did not list any money owed to her parents. Amy's parents "possibly" had provided her with $30,000, or about $1,875 a month, in the past 16 months.

¶ 11    Steven Crowley, Amy's father, testified as follows. In the past 18 months, Crowley had provided Amy with approximately $34,536, of which $32,387 was loans and $2,149 was gifts. Amy did not sign promissory notes for the loans, but Crowley believed that she would pay him back "if and when she could." Crowley also agreed that, if Amy could not pay him back, "she just won't." Although Crowley had no plans at "this minute" to say no to Amy if she needed financial assistance, he probably would not continue to give Amy money in the future, because he was going to retire at the end of the year.

¶ 12    Randy testified as follows. Randy had worked as an estimator and project manager for the same company for the past 20 years and currently earned $91,000 a year. Randy and his girlfriend, Stephanie Bailey, closed on a house located in Island Lake (the Island Lake house) in April 2015. The down payment for the house came from Stephanie's 401(k) account. Randy did not contribute any money to the down payment. The outstanding mortgage on the house was approximately $320,000. Randy opined that the current value of the house was approximately $300,000, based on a listing of an "exact same house" in the same subdivision that he believed was listed for under $320,000 and had been on the market for "quite a while."

¶ 13    During cross-examination, Randy testified that on his financial affidavit he valued the Island Lake house at $350,000.

¶ 14    During redirect examination, Randy testified that he and Stephanie had "an arrangement" that when the Island Lake house was sold Stephanie would receive her 401(k) money back. If there were proceeds left over, she and Randy would split them "50/50."

¶ 15    Stephanie testified as follows. Stephanie and Randy lived together in the Island Lake house, which they owned together. An agreement for the purchase of the Island Lake house was admitted into evidence. The agreement was signed by Stephanie and Randy in August 2014 and showed $17,860 in deposits and down payments on the house. Stephanie testified that the $17,860 came from her 401(k) account; Randy provided none of it. A "HUD Settlement Statement" was admitted into evidence. The statement indicated that Stephanie and Randy closed on the house in April 2015, and it showed deposits and down payments totaling $17,860. Stephanie and Randy shared a joint checking account. They deposited their paychecks into that account and paid the household bills from it. Randy paid half of the mortgage payments on the Island Lake house.

¶ 16    During cross-examination, Stephanie testified that she deposited the funds from her 401(k) account into her and Randy's joint checking account. The Island Lake house was a single-family ranch house and cost $355,000. In August 2014, before Stephanie had received the money from her 401(k) account, Stephanie and Randy paid the first earnest-money deposit of $2,000 from their joint checking account. In September 2014, Stephanie and Randy paid the $16,860 balance of the earnest money out of their joint checking account.

¶ 17    During Stephanie's redirect examination, statements and cancelled checks from Stephanie's and Randy's joint checking account, and checks issued to Stephanie from her 401(k)

account fund manager, Charles Schwab (Schwab), were admitted into evidence. A Schwab check stub dated August 27, 2014, indicated that a check was issued to Stephanie in the amount of $18,000. The bank statements showed that on September 3, 2014, $18,000 was deposited into Stephanie's and Randy's joint checking account. A check in the amount of $16,860, dated September 6, 2014, was made payable to the builder of the Island Lake house. Stephanie testified that this check was for the second earnest-money payment. The bank statements also showed that on March 24, 2015, $25,000 was deposited into the joint account. Stephanie testified that the source of the money was her 401(k) account. The bank statements also showed two separate withdrawals on April 23, 2015, for $3,000 and $14,000. Stephanie testified that "they" needed the $3,000 because "they" were originally told to bring $14,000 to the closing and then "they" were told to bring $17,000.

¶ 18 On July 7, 2016, the trial court issued a "Memorandum Decision and Order" containing a summation of the evidence, the court's findings of fact, and its rulings regarding, *inter alia*, the classification and distribution of assets and the duration and amount of maintenance awarded to Amy.

¶ 19 Regarding the Island Lake house, the trial court found that Randy's undivided one-half interest in that property was marital property. The trial court stated that the evidence established:

"[A]lthough all the deposits utilized for the purchase of the home came from Randy and Stephanie's joint bank account, the source of all the funds originated from Stephanie. *** That said, the testimony presented and exhibits received into evidence also established that Randy's paychecks are deposited into his and Stephanie's joint bank account, Randy pays his one-half (1/2) share of the mortgage from their joint bank account ***. Additionally[,] there was no clear and convincing evidence *** which

would establish that the funds provided by Stephanie for the purchase of the home were intended to be a gift to Randy."

¶ 20    Therefore, the trial court found that Randy failed to rebut the presumption that the Island Lake house—acquired during the course of the marriage—was marital property.  The trial court found that the value of Randy's 50% undivided interest in the Island Lake house was $13,500, based on the purchase price of $355,000 minus the outstanding mortgage of $328,000, which totals $27,000, 50% of which equals $13,500.  The trial court awarded Amy $6,750, representing 50% of Randy's interest in the Island Lake house.

¶ 21    Regarding maintenance, the trial court considered the factors provided in section 504(a) of the Illinois Marriage and Dissolution of Marriage Act (Act).  750 ILCS 5/504(a) (West 2016). The trial court found that Amy earned an approximate gross annual income of $26,135 while Randy earned $91,000.  The trial court stated:

"Based upon the formula set forth in Section 504(b-1), the statutory amount of maintenance awarded to Amy per month is $1,840.00 for a duration of 270 months.  The Court heard no credible evidence, nor received any exhibits into evidence, which would compel the Court to deviate from the statutory formula it is required to utilize in making the determination for the monthly amount of maintenance.

Regarding the 270-month duration of maintenance pursuant to the formula set forth in Section 504(b-1)(1)(B), the Court finds it appropriate to deviate from the statutory guidelines based upon the testimony presented and exhibits entered into evidence including, but not limited to, the relative young age of the parties; the allocation of the marital property and assignment of the marital debt; Amy's marginal underemployment and her proven ability to earn an approximate gross annual income of

$39,600.00, the financial assistance which Amy received(s) from her parents; as well as the other statutory factors set forth in Section 504 of the [Act].

Based upon the foregoing, the Court awards to Amy reviewable maintenance at the properly calculated monthly amount pursuant to Section 504(b-1) of $1,840.00 for a duration of ninety-six (96) months from Randy ***."

¶ 22    On July 26, 2016, the trial court entered the judgment dissolving the parties' marriage. Randy filed a notice of appeal on July 29, 2016.

¶ 23                                II. ANALYSIS

¶ 24                               A. Maintenance

¶ 25    Randy argues that the trial court's maintenance award of $1,840 per month was an abuse of discretion and that its findings were against the manifest weight of the evidence. Specifically, Randy contends that the trial court erred (1) by finding that Amy's gross yearly income was approximately $26,135, (2) by incorrectly applying the guidelines in section 504(b-1)(1)(A) of the Act (750 ILCS 5/504(b-1)(1)(A) (West 2016)) in calculating maintenance, and (3) by failing to impute income to Amy because she has failed to take advantage of employment opportunities.

¶ 26    Generally, a trial court's award of maintenance is presumed to be correct. *In re Marriage of Nord*, 402 Ill. App. 3d 288, 292 (2010). The amount of a maintenance award lies within the sound discretion of the trial court, and this court must not reverse that decision unless it is an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005). A court abuses its discretion where its findings are arbitrary or fanciful (*Blum v. Koster*, 235 Ill. 2d 21, 36 (2009)), or where no reasonable person would agree with its position (*Schneider*, 214 Ill. 2d at 173).

¶ 27    Section 504(a) of the Act provides that, in a proceeding for dissolution of marriage, a trial court "may grant a maintenance award for either spouse in amounts and for periods of time as

the court deems just." 750 ILCS 5/504(a) (West 2016). Section 504(a) lists several factors that a trial court must consider, where relevant, when determining a maintenance award: (1) the income and property of each party, including the marital property apportioned and the nonmarital property assigned to the party seeking maintenance; (2) the needs of each party; (3) the present and future earning capacity of each party; (4) any impairment of the realistic present and future earning capacity of the party seeking maintenance due to that party's devoting time to domestic duties or having forgone or delayed education or training, employment, or career opportunities due to the marriage; (5) any impairment of the realistic present or future earning capacity of the party against whom maintenance is sought; (6) the time necessary to enable the party seeking maintenance to acquire appropriate education, training, and employment, and whether that party is able to support himself or herself through appropriate employment; (7) the standard of living established during the marriage; (8) the duration of the marriage; (9) the age, health, occupation, amount and sources of income, employability, and liabilities of each party; (10) all sources of public and private income, including, without limitation, disability and retirement income; (11) the tax consequences of the property division; (12) the contributions and services by the party seeking maintenance to the education, training, or career potential of the other party; (13) any valid agreement between the parties; and (14) any other factor that the trial court finds just and equitable. *Id.*

¶ 28     Trial courts have wide latitude in considering which factors should be used in determining reasonable needs, and the court is not limited to the factors listed in the statute. *In re Marriage of Brankin*, 2012 IL App (2d) 110203, ¶ 10. No single factor is determinative of the propriety of a maintenance award once it has been determined that an award is appropriate. *Id.*

¶ 29    Randy contends that the trial court's finding that Amy's gross yearly income was approximately $26,135 was against the manifest weight of the evidence because (1) the trial court miscalculated Amy's wages, using her three most recent paystubs, and (2) the trial court failed to include approximately $15,349 a year that Amy received from her parents.

¶ 30    When, as here, a party challenges a trial court's factual findings regarding maintenance, we will not reverse those findings unless they were against the manifest weight of the evidence. See *Nord*, 402 Ill. App. 3d at 294.  Findings are "against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence."  (Internal quotation marks omitted.)  *Id*.

¶ 31    Randy argues that the trial court's finding that Amy's gross annual income was approximately $26,135 has no basis in the evidence.  Randy contends that the three paystubs Amy submitted to the court showed an average of $1,111.40 per two-week pay period, which, multiplied by 26 pay periods, would constitute a gross annual income of $28,896.40.  Randy argues in the alternative that, if Amy's gross pay as shown on her April 28, 2016, pay stub represents her pay through one-third of the year, multiplying by three would show a gross annual income of $27,018.

¶ 32    Although Randy's alternative calculations of Amy's gross annual income might be reasonable, that does not mean that the trial court's finding was against the manifest weight of the evidence.  The trial court's finding that Amy's gross annual income was approximately $26,135 was supported by the evidence.  Amy testified that she earned $23,000 a year at her current job at Mercy Health Systems.  Amy's paystubs indicated that her hourly rate was $13.61.  Amy also testified that she was scheduled to work between 32 and 37 hours a week and that, although she occasionally worked overtime, she could not work more hours and take care of her

health. If Amy worked 37 hours a week for 50 weeks, her gross annual income would be $25,178.50. Thus, the trial court's finding that Amy's gross annual income was $26,135 was not against the manifest weight of the evidence.

¶ 33    Next, Randy argues that, when calculating Amy's gross annual income, the trial court should have included the approximately $15,349 a year Amy received from her parents. Randy argues that the money Amy received from her parents must be considered income for purposes of maintenance because the money was a gift.

¶ 34    The record indicates that the trial court considered Amy's parents' financial assistance in accordance with the Act. Section 504(b-1)(1) provides:

"(b-1) Amount and duration of maintenance. If the court determines that a maintenance award is appropriate, the court shall order maintenance in accordance with either paragraph (1) or (2) of this subsection (b-1):

(1) Maintenance award in accordance with guidelines. In situations when the combined gross income of the parties is less than $250,000 and the payor has no obligation to pay child support or maintenance or both from a prior relationship, maintenance payable after the date the parties' marriage is dissolved shall be in accordance with subparagraphs (A) and (B) of this paragraph (1), *unless the court makes a finding that the application of the guidelines would be inappropriate.*

(A) The amount of maintenance under this paragraph (1) shall be calculated by taking 30% of the payor's gross income minus 20% of the payee's gross income. The amount calculated as maintenance, however, when added to the gross income of the payee, may not result in the payee

receiving an amount that is in excess of 40% of the combined gross income of the parties.

(B) The duration of an award under this paragraph (1) shall be calculated by multiplying the length of the marriage at the time the action was commenced by whichever of the following factors applies: 5 years or less (.20); more than 5 years but less than 10 years (.40); 10 years or more but less than 15 years (.60); or 15 years or more but less than 20 years (.80). For a marriage of 20 or more years, the court, in its discretion, shall order either permanent maintenance or maintenance for a period equal to the length of the marriage." (Emphasis added.) 750 ILCS 5/504(b-1)(1) (West 2016).

¶ 35 Here, the guidelines set forth in section 504(b-1)(1)(B) indicate that Amy should have received maintenance for 270 months. However, the trial court deviated downward from the guidelines, granting Amy maintenance for 96 months. The trial court based its deviation, in part, on "the financial assistance which Amy received(s) from her parents." Thus, the trial court considered Amy's parents' financial assistance by limiting the duration of maintenance, in accordance with section 504(b-1)(1) of the Act.

¶ 36 Randy cites *In re Marriage of Rogers*, 213 Ill. 2d 129 (2004), to support his argument. In *Rogers*, the supreme court ruled that monetary gifts are to be considered income for purposes of child support and that all of the funds in question constituted gifts. *Id.* at 137. In *Rogers*, the father testified that "the gifts and loans from his family 'represent a steady source of dependable annual income *** he has received each year over the course of his adult life.' " *Id*. at 134.

¶ 37 Unlike in *Rogers*, here, there was no evidence that Amy's parents had provided her with financial assistance every year of her entire adult life. Rather, the evidence showed that Amy's parents began to provide her with money when the parties separated. Further, there was evidence that the financial assistance might not continue in the future. Thus, this case is factually distinguishable from *Rogers*.

¶ 38 Further, the *Rogers* court explained:

"[W]e hasten to add that the nonrecurring nature of an income stream is not irrelevant. Recurring or not, the income must be included by the circuit court in the first instance when it computes a parent's 'net income' and applies the statutory guidelines for determining the minimum amount of support due under section 505(a)(1) of the Act. If, however, the evidence shows that a parent is unlikely to continue receiving certain payments in the future, the circuit court may consider that fact when determining, under section 505(a)(2) of the Act (750 ILCS 5/505(a)(2) (West 2002)), whether, and to what extent, deviation from the statutory support guidelines is warranted." *Id*. at 139.

¶ 39 We note that, in *Rogers*, child support was at issue pursuant to section 505(a) of the Act, whereas here, maintenance was at issue pursuant to section 504(b-1)(1). These are different statutory schemes. Regarding child support, a deviation is permitted only in the second step, pursuant to section 505(a)(2). Regarding maintenance, a deviation is permitted as to both the amount and the duration, where "the court makes a finding that the application of the guidelines would be inappropriate," pursuant to section 504(b-1)(1) (750 ILCS 5/504(b-1)(1) (West 2016)). In this regard, *Rogers* is inapplicable to this case.

¶ 40 Randy also argues that the trial court erred in calculating statutory maintenance pursuant to section 504(b-1)(1)(A) of the Act. In construing a statute, our primary goal is to ascertain and

give effect to the intent of the legislature. *MidAmerica Bank, FSB v. Charter One Bank, FSB*, 232 Ill. 2d 560, 565 (2009). The best evidence of the legislature's intent is the language in the statute, given its plain and ordinary meaning. *In re Marriage of Turk*, 2014 IL 116730, ¶ 15. Statutory construction is a question of law, which we review *de novo*. See *id*. ¶ 14.

¶ 41 Here, there is no dispute that the parties' combined gross income was less than $250,000. The trial court found that Randy's and Amy's annual gross incomes were $91,000 and $26,135 respectively, for a combined gross income of $117,135. Further, Randy had no obligation to pay child support or maintenance from a prior relationship. Therefore, absent a finding that the application of the guidelines would be inappropriate, the trial court's maintenance award, in amount and duration, was required "to be in accordance with subparagraphs (A) and (B)" of section 504(b-1)(1). 750 ILCS 5/504(b-1)(1) (West 2016).

¶ 42 Regarding the amount of maintenance, Randy contends that the trial court erred by failing to apply the 40% cap provided in the second sentence of section 504(b-1)(1)(A). Amy counters that the trial court did not err if her gross annual income was $23,200.

¶ 43 Initially, we note that the trial court expressly found that Amy's gross annual income was $26,135. Further, the trial court awarded Amy maintenance in the amount of $1,840 per month for 96 months, stating that it had "properly calculated [the] monthly amount pursuant to Section 504(b-1)."

¶ 44 It appears from the record that the trial court calculated the amount of maintenance by applying the formula provided in only the first sentence of section 504(b-1)(1)(A), which provides, "The amount of maintenance *** shall be calculated by taking 30% of the payor's gross income minus 20% of the payee's gross income." 750 ILCS 5/504(b-1)(1)(A) (West 2016). The trial court found that Randy's gross income was $91,000 (30% = $27,300) and that

Amy's gross income was $26,135 (20% = $5,227). Subtracting $5,227 from $27,300 equals $22,073 (or approximately $1,840 a month).

¶ 45    The record thus supports Randy's contention that the trial court failed to apply the second sentence of section 504(b-1)(1)(A), which caps maintenance in the following manner:

> "The amount calculated as maintenance, however, when added to the gross income of the payee, may not result in the payee receiving an amount that is in excess of 40% of the combined gross income of the parties." *Id.*

¶ 46    Here, the trial court's award exceeds the 40% cap. According to the record and the trial court's findings, 40% of the parties' combined gross annual income is $46,854. However, the trial court awarded Amy $1,840 per month or $22,080 annually, and her maintenance added to her gross annual income equals $48,215.

¶ 47    To be clear, section 504(b-1)(1) does not mandate strict compliance with these formulas in every case. Rather, the statute provides that the guidelines must be followed "unless the court makes a finding that the application of the guidelines would be inappropriate." 750 ILCS 5/504(b-1)(1) (West 2016). Here, as to the duration of maintenance, the trial court deviated downward from the guideline set forth in section 504(b-1)(1)(B), from 270 to 96 months. In doing so, the trial court properly made findings in support of this deviation.

¶ 48    Regarding the amount of maintenance, however, the trial court found no evidence to support a deviation from the guideline set forth in section 504(b-1). The trial court applied the formula provided in the first sentence of section 504(b-1)(1)(A) but failed to apply the 40% cap required by the second sentence. Accordingly, pursuant to our authority under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we reduce the trial court's award of maintenance to $1,727 per month.

¶ 49    Next, Randy argues that the trial court erred in calculating maintenance by failing to impute income to Amy due to her underemployment. The trial court's downward deviation from the statutory guideline of 270 months to 96 months was due in part to "Amy's marginal under-employment and her proven ability to earn an approximate gross annual income of $39,600." Thus, the trial court considered Amy's underemployment and greatly limited the duration of Randy's maintenance obligation. Accordingly, the trial court did not abuse its discretion regarding this issue.

¶ 50                         B. Distribution of Marital Property

¶ 51    Randy argues that the trial court erred by classifying as marital property Randy's interest in the Island Lake house. Randy contends that his interest in the house was a gift, and therefore nonmarital, because it was purchased with funds from Stephanie's 401(k) account.

¶ 52    It is undisputed that Randy acquired his interest in the Island Lake house during the parties' marriage. Accordingly, the interest is presumptively marital. 750 ILCS 5/503(b) (West 2016) (property acquired by either spouse during the marriage is presumed to be marital property regardless of how title is actually held); see also *In re Marriage of Dann*, 2012 IL App (2d) 100343, ¶ 74. This presumption includes property held solely in one party's name. 750 ILCS 5/503(b) (West 2016); see also *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 69. To overcome the presumption that his interest in the house was marital Randy had to produce clear and convincing evidence that he acquired his interest by one of the means specified in section 503(a) of the Act. *Foster*, 2014 IL App (1st) 123078, ¶ 74. At trial, Randy relied on section 503(a)(1) of the Act, which provides that nonmarital property includes "property acquired by gift." 750 ILCS 5/503(a)(1) (West 2016). But the trial court found that Randy's interest in the house was not a gift and therefore was marital property. We will not disturb the trial court's

classification of property unless the decision was against the manifest weight of the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44.

¶ 53    Randy urges us to review *de novo* the trial court's classification of the Island Lake house as marital property. Randy cites *In re Marriage of Joynt*, 375 Ill. App. 3d 817 (2007), to support his argument. In *Joynt*, the facts were undisputed. *Id*. at 819. But in this case the parties dispute whether Randy's interest in the Island Lake house was a gift from Stephanie. Thus, *Joynt* is distinguishable from this case.

¶ 54    A "gift" is defined as a " 'voluntary, gratuitous transfer of property by one to another,' " and it is " 'essential to a gift that it should be without consideration.' " *Provena Covenant Medical Center v. Department of Revenue*, 236 Ill. 2d 368, 401 (2010) (quoting *Martin v. Martin*, 202 Ill. 382, 388 (1903)); see also *In re Marriage of Agazim*, 147 Ill. App. 3d 646, 648-49 (1986) (defining a "gift" as "a voluntary, gratuitous transfer of property by one to another where the donor evidences an intent to make such a gift and absolutely and irrevocably delivers the property to the donee"); Black's Law Dictionary 619 (5th ed. 1979) ("[a gift] is a voluntary transfer of property to another made gratuitously and without consideration").

¶ 55    The facts support the trial court's finding that the money provided by Stephanie for the purchase of the house was not intended to be a gift to Randy. "A gift to a donee is not shown unless the donor has relinquished all present *and future* dominion and power over the subject matter of the gift." *Hall v. Country Casualty Insurance Co.*, 204 Ill. App. 3d 756, 778 (1990). Randy testified that he and Stephanie had "an arrangement" that when the house was sold Stephanie would receive her 401(k) money back and, if any proceeds remained, she and Randy would split them. Because Stephanie did not absolutely and irrevocably relinquish future dominion of the 401(k) money used to purchase the house, the money was not a gift to Randy.

Further, neither Stephanie nor Randy testified that the money was a gift to Randy. Accordingly, the trial court's finding that Randy's interest in the Island Lake house was marital was not against the manifest weight of the evidence.

¶ 56 Next, Randy argues that the trial court erred by valuing his interest in the Island Lake house at $13,500. Generally, the valuation of a marital asset is an issue of fact, and the trial court's ruling will not be disturbed unless it was against the manifest weight of the evidence. See *In re Marriage of Hubbs*, 363 Ill. App. 3d 696, 699-700 (2006). Decisions concerning the distribution of marital property lie within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Joynt*, 375 Ill. App. 3d at 822. The Act does not require the trial court to distribute property with mathematical equality; rather, "[t]he touchstone of proper apportionment is whether it is equitable in nature." *In re Marriage of Drury*, 317 Ill. App. 3d 201, 211 (2000).

¶ 57 Here, the trial court found that the equity in the house was $27,000: the difference between what Randy and Stephanie paid for the house, $355,000, and the principal balance on their mortgage, $328,000. The trial court then found that half of the equity, $13,500, was marital property and awarded Amy half of that, $6,750.

¶ 58 Randy contends that the trial court abused its discretion by awarding Amy any part of the equity in the Island Lake house, because all of the equity in the house belongs solely to Stephanie, as she contributed all of the down payment from her 401(k) account and Randy and Stephanie agreed that Stephanie would get her 401(k) money back before Randy would be entitled to any money from the home.

¶ 59 We disagree with Randy. Randy presumes that the house would be sold and that his purported agreement with Stephanie would be enforceable. There is a dearth of evidence

supporting the agreement. We recognize that Randy testified that he and Stephanie had the agreement. But Randy did not testify as to how, when, or where this purported agreement was entered into or when or whether he and Stephanie agreed to sell the house. Further, the record contains no testimony from Stephanie regarding the agreement, no written agreement, and no evidence of a lien against the property. The record contains evidence that the fair market value of the house was $355,000 and that the balance on the mortgage was $328,000. Therefore, we cannot say that the trial court erred in finding that the value of Randy's interest in the house was half of the equity in the house, or $13,500, and awarding half of that to Amy.

¶ 60    Randy also argues that the trial court abused its discretion by awarding Amy any part of the equity when Amy contributed nothing to the house. Randy correctly notes that one of the factors a trial court is to consider when distributing marital property is each *party's* contribution to the acquisition or increase in value of the marital property. See 750 ILCS 5/503(d)(1) (West 2016).

¶ 61    Initially, we note that Stephanie is not a party here. Thus, the trial court was not required to consider her contribution to the acquisition of the Island Lake house. Further, a party's "financial contribution to the acquisition of marital assets is only one of several factors to be considered by the trial court in determining the equitable distribution of marital assets." *In re Marriage of Lee*, 246 Ill. App. 3d 628, 638 (1993) (rejecting the husband's claim that the trial court's awarding the wife a greater percentage of the marital assets was an abuse of discretion simply because he made a greater financial contribution to the acquisition of the assets). A party's greater financial contribution might support a disproportionate property award in favor of the contributing spouse. See, *e.g.*, *In re Marriage of Jones*, 187 Ill. App. 3d 206 (1989); *In re Marriage of Guntren*, 141 Ill. App. 3d 1 (1986). But "a spouse's greater financial contributions

do not necessarily entitle him or her to a greater share of the marital assets." *In re Marriage of Scoville*, 233 Ill. App. 3d 746, 758 (1992). When dividing marital property, a trial court must consider all relevant factors listed in section 503(d) of the Act, including "the duration of the marriage" and each party's age, health, occupation, amount and sources of income, and needs. 750 ILCS 5/503(d)(4), (d)(8) (West 2016).

¶ 62    Considering the 22½-year duration of the marriage and Amy's significant health issues, we cannot say that the trial court abused its discretion by awarding Amy $6,750, representing half of Randy's interest in, or the marital portion of, the Island Lake house.

¶ 63                                III. CONCLUSION

¶ 64    We affirm the trial court's judgment but, pursuant to our authority under Rule 366(a)(5), we modify the judgment to reflect an award of maintenance in the amount of $1,727 a month.

¶ 65    Affirmed as modified.